69 P.3d 88

STATE of Hawai'i, Plaintiff–Appellee,

v.

Marie VAN DYKE, Personal Representative on behalf of Kennard Montez, Defendant–Appellant.

No. 24659.

Supreme Court of Hawai'i.

May 16, 2003.

As Corrected May 23, 2003.

As Amended June 5, 2003.

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellant Kennard Montez.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee State of Hawai'i.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., Circuit Judge NAKAMURA, in Place of ACOBA, J., who is Unavailable, and Circuit Judge MASUOKA, Assigned by Reason of Vacancy.

## Opinion of the Court by LEVINSON, J.

The defendant-appellant Kennard Montez[1] appeals from the amended judgement of the first circuit court, the Honorable Virginia Lea Crandall presiding, convicting him of and sentencing him for the offense of reckless manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (1993 and Supp.1999).[2] On appeal, Montez contends that the circuit court: (1) erred in failing to instruct the jury that, as an "attendant circumstance" element of second degree murder and reckless manslaughter, the prosecution had the burden of proving beyond a reasonable doubt that Montez did not act in self-defense; (2) erred in refusing to instruct the jury as to the purportedly included offenses of first and second degree assault, as set forth in HRS §§ 707–710 (1993) and 707–711 (1993),[3] respectively, where there was sufficient evidence adduced at trial to support the instructions; (3) erred in failing to instruct the jury as to the use of "force," in addition to the use of "deadly force," with respect to the circuit court's self-defense instruction; (4) plainly erred in admitting the expert testimony of Gary Farkas, Ph.D., who testified that persons having a predisposition to violence will likely commit violent acts while under the influence of alcohol; (5) erred in granting the prosecution's motion for an extended term of imprisonment, pursuant to HRS § 706–662(3) (Supp. 1999),[4] and sentencing Montez to a term of

1. On January 25, 2003, Montez passed away while he was in custody at the Hālawa Correctional Facility. On January 28, 2003, this court issued an order requesting that Montez's counsel: (1) inform this court whether Montez had died during the pendency of his appeal; (2) if so, submit a copy of Montez's death certificate; and (3) move, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(a), for substitution of a proper party-defendant-appellant or advise this court that no such motion would be filed. On March 7, 2003, Marie Van Dyke, Montez's sister and the personal representative of his estate, moved for leave to substitute as a party-defendant-appellant pursuant to HRAP Rule 43(a). On March 18, 2003, this court granted Van Dyke's motion for substitution and ordered that she be substituted as a party-defendant-appellant for purposes of the present appeal. *See State v. Makaila*, 79 Hawai'i 40, 45, 897 P.2d 967, 972 (1995) (holding that HRAP Rule 43(a) allows for the substitution of a party for a deceased criminal defendant and that a criminal defendant's personal representative may file a motion for substitution within a reasonable amount of time after death).

2. HRS § 707–702 provides in relevant part:

 **Manslaughter.** (1) A person commits the offense of manslaughter if:
 (a) He recklessly causes the death of another person[.]
 . . . .
 (3) Manslaughter is a class A felony.

3. HRS § 707–710(1) provides in relevant part that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person." "Assault in the first degree is a class B felony." HRS § 707–710(2). HRS § 707–711(1) provides in relevant part that "[a] person commits the offense of assault in the second degree if: (a) [t]he person intentionally or knowingly causes substantial bodily injury to another; [or] (b) [t]he person recklessly causes serious bodily injury to another person...." "Assault in the second degree is a class C felony." HRS § 707–711(2).

4. HRS § 706–662(3) provides:
 **Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:

life imprisonment with the possibility of parole; and (6) erred, with respect to its decision to grant the prosecution's motion for an extended term of imprisonment, in relying on the 1982 uncharged murder of Javier Arceo, in which Montez was allegedly involved, thereby violating Montez's constitutional rights to due process, as guaranteed by article 1, section 5 of the Hawai'i Constitution and the fourteenth amendment to the United States Constitution,[5] and to confront adverse witnesses, as guaranteed by article 1, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution.[6] We agree with Montez that the circuit court's error in failing to instruct the jury as to the use of "force," in addition to the use of "deadly force," in connection with its self-defense instruction was not harmless beyond a reasonable doubt. We do not believe, however, that the circuit court's jury instructions regarding the applicability of the justification of self-defense to second degree murder and reckless manslaughter were prejudicially insufficient, erroneous, inconsistent, or misleading. Accordingly, we reverse the circuit court's amended judgment of conviction and sentence, filed on October 4, 2001.[7]

## I. BACKGROUND

### A. Factual Background

The present appeal arises out of a fatal altercation that occurred on April 1, 2000 between Montez and Henry Paoa. The following evidence was adduced at Montez's jury trial, which commenced on September 5, 2000.

Montez, who was an attorney licensed to practice law in the state of Arkansas, had relocated to Hawai'i in June 1999, after having been diagnosed as suffering from a brain tumor. Montez's friend, Jeff Wilks, owned a condominium apartment, located at 469 'Ena Road, in the City and County of Honolulu, and had arranged for Montez to reside there temporarily in order to attend to his medical needs in a relaxed environment. Montez ultimately planned to reside permanently in Hawai'i and practice patent law.

On April 1, 2000, Montez attended a Toastmasters event in Moili'ili in order to meet new people in the Honolulu area and gain public speaking experience. After the event, Montez accompanied Violet Mata to a dancing establishment at the Hale Koa Hotel in Waikīkī, where Montez consumed approximately five alcoholic beverages. Mata thereafter drove Montez back to his apartment.

After consuming several cans of beer at his apartment, Montez walked across the street to the Evolution Nightclub. He attempted to enter the nightclub at approximately 2:30 a.m. on April 2, 2000, but Juan Marti, the doorman, informed him that the establishment was temporarily closed until 3:00 a.m. According to Marti, Montez became aggressively persistent that he be allowed to enter the nightclub, but Marti insisted that Montez immediately leave the premises. Montez eventually left and encountered Derek Montervon, who was standing across the street at

.... 
(3) The defendant is a dangerous person whose imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless the defendant has been subjected to a psychiatric or psychological evaluation that documents a significant history of dangerousness to others resulting in criminally violent conduct, and this history makes the defendant a serious danger to others. Nothing in this section precludes the introduction of victim-related data in order to establish dangerousness in accord with the Hawai'i Rules of Evidence.

5. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" The fourteenth amendment to the United States Constitution provides in relevant part that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law[.]"

6. Article I, section 14 of the Hawai'i Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused[.]" The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]"

7. In light of Montez's death, there will be no retrial in the present matter, and, thus, we need not address his remaining points of error on appeal.

a 7–Eleven store. Montervon testified that Montez appeared to be angry at Marti and that Montez suggested to Montervon that they "go in there and break everybody's asses." While conversing with Montervon, Paoa, who identified himself as "Rick," approached Montez and asked him for a cigarette. Paoa and Montez engaged in casual conversation, in the course of which Paoa invited Montez to accompany him to meet a couple of "strippers"; they proceeded in a taxicab to an adult entertainment establishment on Kapi'olani Boulevard. When Montez realized that Paoa had taken him to a "strip club," Montez refused to enter, and the men decided to return to Montez's apartment.

While inside Montez's apartment, Paoa began to smoke what appeared to be "crack" cocaine, at which time Montez demanded that he cease the smoking because he did not own the apartment. Thereafter, Montez and Paoa discussed whether Paoa should arrange for some in-home female companionship and marijuana. Paoa subsequently left Montez's apartment and later returned with a woman who, according to Paoa, would engage in sexual intercourse with Montez for three hundred dollars. Montez declined the offer and explained to Paoa that he had expected him to return with a stripper, not a prostitute. When Montez refused to pay for the woman's services, Paoa became extremely angry, picked up the television set from the shelf in the living room, and threw it onto the ground. Paoa then grasped a beer bottle from his backpack and struck Montez in the mouth, causing Montez to bleed significantly. Montez and Paoa began to struggle violently as Paoa pushed Montez backwards toward the edge of the lānai;[8] Montez repeatedly shouted for help during the struggle. Both Montez and Paoa eventually fell to the floor, at which time Montez ran toward the front door of the apartment until Paoa grasped Montez's shirt, pulled him to the floor, and

began to wrestle with Montez. Montez testified that, when he again called for help, Paoa threatened to "kill him" if he did not "shut up."[9]

The struggle eventually proceeded to the kitchen. Montez testified that he heard the silverware basket rattle and believed that Paoa would attempt to stab him with a kitchen knife. The men continued to wrestle and fell to the kitchen floor, lying next to one another. Montez took control of Paoa by placing his hands "on both sides of [Paoa's] head so that [his] thumbs were positioned over his eyes and [he] just thrust [Paoa's] head against the floor"; the physical altercation ceased at that point.

Meanwhile, Vera Mitchell, who resided in the apartment directly below Montez's, telephoned the HPD after hearing "suspicious noises" of an altercation and a male voice crying for help. Soon thereafter, HPD Officer Scott Tamaoka arrived at Montez's apartment. Officer Tamaoka testified that the apartment appeared to be "ransacked" with a television and stereo equipment "torn up and out of place." Officer Tamaoka inquired as to what had happened, in response to which Montez stated that Paoa had arrived at his apartment with a prostitute and had then attacked him; Montez testified that he had not provoked Paoa's use of force and had never intended to cause Paoa's death. Upon further questioning by HPD Officer Leonard Kupihea, Montez maintained that he had acted in self-defense in response to Paoa's attack. Detective Fitchett recovered a "crack" pipe in Montez's apartment, which, upon criminology testing, contained .001 grams of cocaine.

Thereafter, the Honolulu Fire Department arrived, and several emergency medical technicians attended to Paoa; Paoa was subsequently transferred by ambulance to Straub Hospital, where Fredrick Ching, M.D., an emergency room physician, pronounced him

---

8. "Lānai" means "[p]orch, veranda, balcony, booth, shed; temporary roofed construction with open sides near a house." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 193 (Rev. ed.1986).

9. It appears from the record that the woman accompanying Paoa left the apartment during the altercation. During the ensuing investiga-

tion, Honolulu Police Department (HPD) Detective Harold Fitchett obtained information that a woman might have been in the apartment during the incident but was unable to identify the woman via eyewitness interviews or latent fingerprinting.

dead at 6:58 a.m. On April 3, 2000, Bani Win, M.D., a deputy medical examiner for the City and County of Honolulu, performed an autopsy on Paoa and opined that the cause of death was asphyxia due to strangulation and that a contributing cause of death was trauma to the head. More specifically, Dr. Win concluded that the strangulation involved a significant amount of pressure, based upon the internal hemorrhaging and fracture of the right thyroid cartilage in the neck. Dr. Win further observed a torn tendon in Paoa's left eyeball area, a small tear on the right eyeball area, and significant bleeding in both eyes, from which she opined that Paoa had sustained direct trauma to his eyeballs, such as fingers in the eyes or squeezing of the eyeballs.[10] Dr. Win testified that Paoa's was "a very traumatic sort of eye injury."

Emergency room physicians treated Montez for lacerations on his upper and lower lips, a fractured tooth, two chipped teeth, and two bottom teeth that had been pushed backwards. Montez exhibited further injuries to his neck, shoulders, back, arms, and legs.[11]

We discuss additional facts as relevant to Montez's points of error on appeal *infra* in Section III.

B. *Procedural Background*

On April 11, 2000, Montez was charged by complaint with the offense of second degree murder, in violation of HRS § 707–701.5 (1993).[12]

During the settlement of jury instructions at trial, Montez objected to the included offense instruction regarding manslaughter proffered by the prosecution. Montez argued that the record generated reasonable

doubt as a matter of law regarding whether the prosecution had proved the state of mind requisite to the commission of second degree murder and that, for strategic reasons, he objected to the jury being instructed as to the included offense of reckless manslaughter. In the alternative, Montez requested, in the event that the circuit court overruled his objection and instructed the jury as to reckless manslaughter, that the jury also be instructed as to what he argued to be the lesser included offenses of assault in the first and second degrees and mutual affray. The circuit court found that there was a rational basis in the evidence adduced at trial for the jury to acquit Montez of the charged offense and to convict him of the lesser included offense of reckless manslaughter and, therefore, denied Montez's request to instruct the jury solely as to second degree murder. On the other hand, the circuit court refused Montez's proposed jury instructions regarding assault in the first and second degrees and mutual affray, on the basis that, in the court's view, the foregoing offenses were not lesser included offenses of second degree murder, Paoa's death in fact being the result of Montez's conduct and, therefore, there being no rational basis in the evidence for acquitting Montez of reckless manslaughter and convicting him of assault in the first degree. Accordingly, the circuit court instructed the jury as follows regarding second degree murder and reckless manslaughter:

> A person commits the offense of Murder in the Second Degree if he intentionally or knowingly causes the death of another person.

---

10. In light of the foregoing, it is noteworthy that toxicology testing of Paoa's blood reported 0.17 milligrams per liter of cocaine, 1.49 milligrams per liter of benzolecgonine, a metabolite of cocaine, and 0.03 milligrams per liter of methamphetamine.

11. In addition, on April 2, 2000, at approximately 12:04 p.m., investigators performed an intoxilyzer test on Montez, which reported that his blood alcohol content (BAC) was 0.059. George Read, Ph.D., a qualified expert in pharmacology, testified that, if a male, in his mid-thirties, approximately six feet two inches in height and weighing two hundred and thirty pounds, possessed a BAC of 0.059 at 12:04 p.m., then, by

mathematical extrapolation to the time of the subject altercation, Montez's BAC would have been approximately 0.198 at 5:30 a.m., a conservative estimate. A BAC of 0.198 amounts to two-and-one-half times the legal drinking limit of 0.08 for purposes of the offense of operating a motor vehicle under the influence of an intoxicant, *see* HRS § 291E–61 (Supp.2002).

12. HRS § 707–701.5 provides in relevant part that, "[e]xcept as provided in [HRS § ] 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

There are two material elements of the offense of Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about April 2nd, 2000, in the City and County of Honolulu, State of Hawai'i, the defendant, Kennard Montez, caused the death of another person; and

2. That the defendant, Kennard Montez, did so intentionally or knowingly.

If, and only if, you find the defendant not guilty of Murder in the Second Degree, or if you are unable to reach a unanimous verdict as to this offense, then you must consider whether the defendant is guilty or not guilty of the included offense of Manslaughter.

A person commits the offense of Manslaughter if he recklessly causes the death of another person.

There are two material elements of the offense of Manslaughter, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about April 2, 2000, in the City and County of Honolulu, State of Hawai'i, the defendant, Kennard Montez, caused the death of another person; and

2. That the defendant, Kennard Montez, did so recklessly.

With respect to the justification of self-defense, Montez requested that the jury be instructed as to the use of "force," in addition to the use of "deadly force." [13] Over defense counsel's general objection, the circuit court gave the following self-defense instruction, which immediately followed the circuit court's reckless manslaughter instruction:

Justifiable use of force, commonly known as self-defense, is a defense to the charge of Murder in the Second Degree and the included offense of Manslaughter.

The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable.

If the prosecution does not meet its burden, then you must find the defendant not guilty. In other words, if you find that the defendant acted in self-defense, then you must find him not guilty.

The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself on the present occasion against death, serious bodily injury, kidnapping, rape, and/or forcible sodomy.

The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provokes the use of force against himself in the same encounter.

The use of deadly force is not justifiable if the defendant knows that he can avoid the necessity of using such force with complete safety by retreating, except that the defendant is not obliged to retreat from his dwelling unless he was the initial aggressor.

If, and only if, you find that the defendant was reckless in having a belief that he was justified in using self-protective force against another person or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such protective force is unavailable as a defense to the offense of manslaughter.

In addition, the circuit court instructed the jury regarding the definitions of the terms "force," "unlawful force," and "deadly force," as follows:

---

13. Montez's proposed jury instruction regarding the justification of self-defense is set forth in relevant part *infra* in section III.B.

"Force" means any bodily impact, restraint, or confinement, or the threat thereof.

"Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force or deadly force.

"Deadly force" means force which the actor uses with the intent of causing, or which he knows to create a substantial risk of causing, death or serious bodily injury.

After the court completed the reading of its instructions to the jury, Montez augmented his objection to the court's self-defense instruction, on the basis that it did not clarify that self-defense was "a complete defense to [second degree m]urder," such that, in the event the jury found him not guilty of second degree murder by reason of self-defense, it "should stop there ... and not get to" the reckless manslaughter instruction.

## II. *STANDARDS OF REVIEW*

### A. *Jury Instructions*

 "The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000) (quotation and internal quotation marks omitted). "[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Sua*, 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999) (quoting *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (quotation omitted)) (brackets in original). In other words,

> [e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

*Id.* (quoting *State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted)).

*State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001).

### B. *Statutory Interpretation*

 "[T]he interpretation of a statute ... is a question of law reviewable de novo." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (*quoting State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704 (1994).....

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [(1993)]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (*quoting State v. Toyomura*, 80 Hawai'i 8,

18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2)(1993). "Laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993). *State v. Rauch,* 94 Hawaiʻi 315, 322–23, 13 P.3d 324, 331–32 (2000) (quoting *State v. Kotis,* 91 Hawaiʻi 319, 327, 984 P.2d 78, 86 (1999) (quoting *State v. Dudoit,* 90 Hawaiʻi 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker,* 90 Hawaiʻi 85, 90–91, 976 P.2d 399, 404–05 (1999) (quoting *Ho v. Leftwich,* 88 Hawaiʻi 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawaiʻi 217, 229–30, 953 P.2d 1315, 1327–28 (1998)))))).

## III. DISCUSSION

A. *When Considered As A Whole, The Circuit Court's Jury Instructions Regarding The Applicability Of The Justification Of Self–Defense To Second Degree Murder And Reckless Manslaughter Were Not Prejudicially Insufficient, Erroneous, Inconsistent, Or Misleading.*

■ Relying primarily on this court's decision in *State v. Culkin,* 97 Hawaiʻi 206, 35 P.3d 233 (2001), Montez argues that the circuit court erred in failing to include the negativing of the justification of self-defense as an enumerated material element in the instructions regarding the charged offense of second degree murder and the lesser included offense of reckless manslaughter. More specifically, Montez contends that the circuit court failed properly to instruct the jury that, in order to convict him of second degree murder or reckless manslaughter, it must find beyond a reasonable doubt that Montez did not act in self-defense during the fatal altercation with Paoa. Montez further asserts that the order of the jury instructions was such that the jury could not evaluate the applicability of self-defense to the charged

offense (second degree murder) *prior* to deliberating on the lesser included offense (reckless manslaughter). Montez maintains that, had the negativing of the justification of self-defense been included as a material element of the charged offense, the jury might have acquitted him of second degree murder based on self-defense and, thus, would not have proceeded to deliberate as to his culpability for reckless manslaughter. Montez's arguments are without merit.

In *Culkin,* the defendant raised the justification of self-defense, a non-affirmative defense, to the charged offense of second degree murder and the lesser included offenses of reckless manslaughter, as well as second and third degree assault. *Culkin,* 97 Hawaiʻi at 213–14, 35 P.3d at 240–41. With the exception of the reckless manslaughter instruction, the circuit court instructed the jury that, as to each offense, the prosecution bore the burden of proving, as a material element of its case-in-chief, that the defendant did not act in self-defense. *Id.* The reckless manslaughter instruction, however, merely instructed the jury that the prosecution bore the burden of proving only that the defendant recklessly caused the death of another person. *Id.* In addition, the circuit court issued a generic instruction that the justification of self-defense " 'is a defense to all offenses brought before the defendant. . . .' " *Id.*

On appeal, this court addressed, *inter alia,* the sufficiency of the jury instructions in light of the circuit court's failure to enumerate the negativing of the justification of self-defense as a material element of the offense of reckless manslaughter. *Culkin,* 97 Hawaiʻi at 211, 35 P.3d at 238. This court recognized that the generic instruction that followed the instruction regarding the elements of second degree murder created the risk that the jury, upon concluding that the defendant was absolutely justified in the use of deadly force and, therefore, was entitled to an across-the-board acquittal, would nevertheless proceed to consider the lesser included offense of reckless manslaughter. *Id.* at 217, 35 P.3d at 244. We noted that "the second degree murder instruction would not be problematic if the reckless manslaughter

instruction was not itself erroneous"—alluding to the fact that the reckless manslaughter instruction (1) had omitted the material element that the prosecution bore the burden of proving beyond a reasonable doubt that the defendant was not justified in using deadly force and (2) erroneously advised that, " '[i]f the prosecution [proves beyond a reasonable doubt that Culkin recklessly caused another person's death], then you *must* return a verdict of guilty of manslaughter based upon reckless conduct.' " *Id.* at 218; 35 P.3d at 245 (brackets and emphasis in original). Inasmuch as it was unclear from the jury instructions whether self-defense applied to the offense of reckless manslaughter, of which the defendant was ultimately convicted, this court held that the circuit court plainly erred in failing to include self-defense as a material element of reckless manslaughter, vacated the defendant's conviction and sentence, and remanded the matter for a new trial. *Id.* at 219, 35 P.3d at 246.

The flawed jury instructions at issue in *Culkin* are distinguishable from those at issue in the present matter. Here, the circuit court instructed the jury as to the material elements of second degree murder and the lesser included offense of reckless manslaughter, omitting therefrom the justification of self-defense. Immediately following the reckless manslaughter instruction, however, the circuit court instructed the jury (1) that "self-defense is a defense to the charge of Murder in the Second Degree *and* the included offense of Manslaughter" and (2) that "[t]he burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable." (Emphasis added.) Thus, "when read and considered as a whole," we believe that the instructions at issue were not "prejudicially insufficient, erroneous, inconsistent, or misleading." *Aganon,* 97 Hawai'i at 302, 36 P.3d at 1272; *State v. Pinero,* 75 Haw. 282, 296–97, 859 P.2d 1369, 1376 (1993) (holding that the circuit court did not plainly err in giving jury instructions that were virtually identical to the instructions read to the jury in the present matter; in particular, the reckless manslaughter instruction did not enumerate the negating of self-defense as a material element, although a general self-

defense instruction advised that the jury must determine whether self-defense applied to lesser included offenses, as well as to the charged offense).

Moreover, Montez's argument that, had the jury instructions correctly set forth the negativing of the justification of self-defense as a material element of second degree murder, the jury might have acquitted him of the charged offense based on self-defense and, thus, would not have proceeded to deliberate as to reckless manslaughter is wrong as a matter of law. HRS § 703–310(1) (1993) provides that,

> [w]hen the actor believes that the use of force upon or toward the person of another is necessary for any of the purposes for which such belief would establish a justification under sections 703–303 to 703–309[,] *but the actor is reckless or negligent in having such belief* or in acquiring or failing to acquire any knowledge or belief which is material to the justifiability of the actor's use of force, *the justification afforded by those sections is unavailable in a prosecution for an offense for which recklessness or negligence, as the case may be, suffices to establish culpability.*

(Emphases added.)

As to the charged offense of second degree murder, the prosecution bore the burden of proving beyond a reasonable doubt that Montez "intentionally or knowingly cause[d] the death of [Paoa]," *see supra* note 10. With respect to the lesser included offense of reckless manslaughter, however, the prosecution bore the burden of proving beyond a reasonable doubt that Montez "recklessly caused the death of [Paoa]," *see supra* note 2. That being the case, although the jury could have acquitted Montez of the charged offense based on self-defense, the jury could also have found that Montez's belief that the use of force toward Paoa was necessary "to protect himself against death [or] serious bodily injury," *see HRS* § 703–304(2) (1993), was reckless, in which case the justification of self-defense would have been unavailable as to the lesser included offense of reckless manslaughter. *See* Commentary on HRS § 703–310 ("[W]here the actor is reckless or

negligent in forming a belief about the existence of facts which would establish a justification for the actor's conduct, the actor does not have a defense of justification for any crime as to which recklessness or negligence suffices to establish culpability."). Thus, the circuit court adequately instructed the jury as to the law, set forth in HRS § 703–310(1), regarding the applicability of the justification of self-defense to the offense of reckless manslaughter.

B. *The Circuit Court's Error In Failing To Instruct The Jury As To The Use Of "Force," In Addition To The Use Of "Deadly Force," In Its Self Defense Instruction Was Not Harmless Beyond A Reasonable Doubt.*

 Montez contends that the circuit court erred in failing to give the jury the defense's requested instruction on self-defense, which addressed the use of "force," as well as "deadly force." Montez argues that the subject of the justified use of self-protective "force" was particularly important in the present case because "[a]n individual can use force against someone in self-defense with absolutely no intent to cause death or without knowing that the strength of that force could result in death." We agree with Montez.

"Self-defense is not an affirmative defense, and the prosecution has the burden of disproving it once evidence of justification has been adduced." *Culkin,* 97 Hawai'i at 215, 35 P.3d at 242; *State v. Lubong,* 77 Hawai'i 429, 431, 886 P.2d 766, 768 (App.1994) ("[O]nce the issue of self-protection is raised, the burden is on the prosecution to disprove the facts that have been introduced or to prove facts negativing the defense and to do so beyond a reasonable doubt."); HRS § 702–205(b) (1993) ("The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as ... [n]egative a defense...."). HRS § 703–304, Hawaii's self-defense statute, provides in relevant part:

(1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

HRS § 703–300 defines "force" as "any bodily impact, restraint, or confinement, or the threat thereof." HRS § 703–300 (1993) also defines "deadly force" in relevant part as "force which the actor uses with the *intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm.*" (Emphasis added.) An obvious distinction between mere "force" and "deadly force" is that the latter is predicated upon requisite alternative states of mind— *i.e., intent* to cause death or serious bodily harm or *knowledge* that such use of force creates a substantial risk of causing death or serious bodily harm.

In the present matter, Montez proposed a self-defense instruction, which included both the "force" and "deadly force" components and provided in relevant part:

Justifiable use of force—commonly known as self-defense—is a defense to the charge of Murder in the Second Degree. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution does not meet its burden, then you must find the defendant not guilty.

The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself on the present occasion against death, serious bodily injury or kidnapping. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.... Over defense counsel's objection, the circuit court instructed the jury only as to the justifiable use of "deadly force." *See supra* section I.B.1.

The record in the present case reflects that the justification of self-defense was Montez's sole defense at trial. Specifically, Montez testified: (1) that, in response to his repeated calls for help during the physical altercation with Paoa, Paoa threatened to "kill him" if he did not "shut up"; (2) that, when the physical altercation with Paoa moved from the lānai to the kitchen, Montez believed that Paoa would attempt to stab him with a kitchen knife; and (3) that Montez responded to Paoa's alleged attack by placing his thumbs over Paoa's eyes and thrusting his head against the floor. Based on the foregoing uncontroverted testimony, Montez effectively conceded that he employed "force" in the course of his altercation with Paoa,

although he insisted that he did so in self-defense. Montez, however, denied that he employed "deadly force" toward or against Paoa, because he had not intended to cause and had not foreseen that he would cause Paoa's death. That being the case, the crux of Montez's defense at trial turned on his state of mind with respect to his use of force at the time of the altercation with Paoa.

▪ It is well settled that, "[i]n a jury trial, [the] Defendant's state of mind is a fact that must be determined by the [trier of fact]," *see State v. Holbron*, 78 Hawai'i 422, 425, 895 P.2d 173, 176 (App.1995), based on the direct and circumstantial evidence adduced at trial. Consequently, the degree of force employed by a defendant in self-defense is a question of fact within the exclusive province of the jury. *Id.; see also State v. Napoleon*, 2 Haw.App. 369, 371, 633 P.2d 547, 549 (1981) ("[W]hen the trier of fact is dealing with the issue of the state of mind, he is entitled to look at the circumstantial evidence as well as the appellant's testimony and[,] if they conflict, to choose between them.").[14] In the present matter, the circuit court conspicuously omitted from its self-defense instruction *any* reference to the use of "force," which, we believe, was essential to Montez's defense at trial, insofar as he expressly disputed whether his use of force constituted "deadly force." Put simply, the circuit court instructed the jury that, as a matter of law, Montez employed "deadly

14. After a bench trial in the district court, the defendant in *Napoleon* was convicted of assault in the third degree. On appeal, he argued that the prosecution had failed to disprove self-defense beyond a reasonable doubt. 2 Haw.App. at 370, 633 P.2d at 548–49. The Intermediate Court of Appeals (ICA) affirmed the defendant's conviction, reasoning as follows:

[The defendant] attacked the complaining witness with a baseball bat using sufficient force to break his arm. [HRS § ] 703–300[] states: "Deadly force" means force which the actor uses with the intent of causing or which he knows to create a substantial risk of causing death or serious bodily harm.... Under this definition, [the defendant], per se, used deadly force in the incident in question. HRS § 703–304(5) provides:

The use of deadly force is not justifiable under this section if:
....

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating ... [.]
Under the evidence, the court below would have been justified and correct in holding that, given the circumstances, [the defendant] knew that he could have safely retreated. *Obviously, when the trier of fact is dealing with the issue of the state of mind, he is entitled to look at the circumstantial evidence as well as the [defendant's] testimony and if they conflict, to choose between them.*

*Id.* at 371, 633 P.2d at 549 (emphasis added) (some ellipsis points added and some in original). We overrule *Napoleon* to the extent that it held that the defendant's conduct—without more—entailed the use of "deadly force" as a *per se* matter, precisely because "deadly force," as statutorily defined, presupposes a requisite state of mind and, as the ICA correctly noted, it is for the trier of fact to "deal[ ] with the issue of the state of mind."

force" against Paoa by virtue of the fact that death, in fact, resulted from Montez's use of force. On its face, however, conduct constituting the use of force resulting in death is not "deadly force" *per se*, inasmuch as such conduct must be accompanied by the requisite state of mind. *See supra* note 16. In other words, Montez is correct that a person *can* use force toward or against another in self-defense with no intent to cause death or without knowledge that such force could create a substantial risk of causing death or serious bodily harm. Thus, inasmuch as a reasonable juror could have found that, notwithstanding Paoa's death, Montez employed "force," and not "deadly force," in the course of his altercation with Paoa, which, if justified, would have entitled Montez to an acquittal, *see supra* section III.A, we cannot conclude that the circuit court's self-defense instruction, when read and considered as a whole, was harmless beyond a reasonable doubt.[15] *See State v. Locquiao*, 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002) ("[I]t is the trial judge's duty to insure that the jury instructions cogently explain the law applicable to the facts of the case and that 'the jury has proper guidance in its consideration of the issues before it.' ") (Internal quotation marks and citations omitted.); *State v. Pemberton*, 71 Haw. 466, 478, 796 P.2d 80, 86 (1990) (" 'Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' ") (Citations omitted.).

## IV. CONCLUSION

In light of the foregoing, we reverse the circuit court's amended judgment of conviction and sentence, filed on October 4, 2001.

---

**15.** In sum, the jury's assessment of the justification of self-defense involves a two-part inquiry. First, the jury must determine the degree of force at issue, as defined by HRS § 703-300, based on the evidence adduced at trial—*i.e.*, "force" or "deadly force." As we have indicated, the defendant's state of mind with respect to his or her use of force is critical to the first inquiry. Second, the jury must determine whether the degree of force was justified, pursuant to HRS §§ 703-304 and 703-310.