178 P.3d 1

STATE of Hawai'i, Plaintiff–
Appellee–Respondent

v.

William MAINAAUPO, Jr., Defendant–
Appellant–Petitioner.

State of Hawai'i, Plaintiff–
Appellee–Respondent

v.

Mark K. Lopez, Defendant–
Appellant–Petitioner.

Nos. 27764, 27969.

Supreme Court of Hawai'i.

March 5, 2008.

As Amended April 4, 2008.

James S. Tabe, Deputy Public Defender (DPD), for the defendant-appellant-petitioner William Mainaaupo, Jr.

Donn Fudo, Deputy Prosecuting Attorney (DPA), for the plaintiff-appellee-respondent State of Hawai'i in No. 27764.

Karen T. Nakasone, DPD (Katie L. Lambert, DPD, on the briefs), for the defendant-appellant-petitioner Mark K. Lopez in No. 27969.

Brian R. Vincent, DPA (Daniel H. Shimizu, DPA, on the briefs), for the plaintiff-appellee-respondent State of Hawai'i in No. 27969.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., concurring and dissenting separately.

## Opinion of the Court by LEVINSON, J.

On December 7, 2007, the defendant-appellant-petitioner Mark K. Lopez filed an application for a writ of certiorari, urging us to review the memorandum opinion (mem. op.) of the Intermediate Court of Appeals (ICA) in *State v. Lopez*, No. 27969, 2007 WL 2430155 [hereinafter, "ICA's *Lopez* mem. op."], and, on December 11, 2007, the defendant-appellant-petitioner William Mainaaupo, Jr., filed an application for a writ of certiorari, asking us to review the ICA's memorandum opinion in *State v. Mainaaupo*, No. 27764, 2007 WL 2576952 [hereinafter, "ICA's *Mainaaupo* mem. op."]. Although these cases are factually unrelated, they share a common legal question: Whether the ICA erred in concluding that the circuit court of the first circuit[1] correctly declined to instruct the jury on the mistake-of-fact defense, as provided by Hawai'i Revised Statutes (HRS) § 702–218 (1993),[2] in relation to charges of the offense of unauthorized control of a propelled vehicle, in violation of HRS § 708–836 (Supp.2001),[3] where the defendant claims a mistaken belief that the person who authorized his use of the vehicle was the registered owner of the vehicle. Beyond this shared issue, Mainaaupo argues that the ICA gravely erred in concluding that the circuit court correctly instructed the jury that, under HRS § 708–836, the defendant has a legal duty to obtain consent to operate the vehicle directly from the registered owner of the vehicle. And Lopez contends that the ICA

gravely erred in concluding that the remarks during closing argument by the plaintiff-appellee-respondent State of Hawai'i [hereinafter, "the prosecution"] regarding Lopez's post-arrest silence and his failure to produce a critical defense witness to corroborate his testimony were legitimate comment on the evidence and not misconduct. We accepted Lopez's and Mainaaupo's applications on January 18, 2008 and consolidated the cases for disposition the same day.

For the reasons discussed herein, we hold (1) that the circuit court erred in declining to give Lopez's and Mainaaupo's mistake-of-fact jury instructions, (2) that the circuit court erred in instructing the jury that Mainaaupo had a legal duty to obtain consent to operate the vehicle directly from the registered owner of the vehicle, (3) that the prosecution's comments regarding Lopez's post-arrest silence were improper, and (4) that the prosecution's comments regarding Lopez's failure to produce a critical defense witness were not improper. Accordingly, we vacate the judgments against Lopez and Mainaaupo and remand their cases for new trials.

## I. BACKGROUND

### A. Background In Lopez

#### 1. Factual background

In May and June 2005, Gregory S. Gittens and Mona S. Gittens were the registered owners of an automobile, a 1995 Honda Accord, and their son, Brian Harris, was the primary driver. Gregory and Harris each had a set of keys to the car, neither of which

---

1. The Honorable Karl K. Sakamoto presided in *Lopez*, and the Honorable Victoria Lea Crandall presided in *Mainaaupo*.

2. HRS § 702–218, entitled "Ignorance or mistake as a defense," provides in relevant part: "In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if: (1) The ignorance or mistake negatives the state of mind required to establish an element of the offense...." (Formatting altered.)

3. HRS § 708–836, entitled "Unauthorized control of propelled vehicle," provides as follows: (1) A person commits the offense of unauthorized control of a propelled vehicle if the per-

son intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent....

....

(3) It is an affirmative defense to a prosecution under this section that the defendant:
(a) Received authorization to use the vehicle from an agent of the owner where the agent had actual or apparent authority to authorize such use....

....

(4) For the purposes of this section, "owner" means the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership....

was ever lost. Aside from some damage to the front of the car, the car was in "pretty good" condition; its door locks and steering column were not damaged, and an after-market sound system, the initial cost of which was between $300.00 and $400.00, was installed in it.

At around 5:00 p.m. on May 31, 2005, Harris drove the car to his workplace at Bandito's Cantina in the Pearlridge Center, located in the City and County of Honolulu, parked the car in the mall's parking lot, locked the doors, and went to work. He left some clothes, his wallet, and over one hundred compact discs in the car. Harris finished work at about 9:00 p.m. only to discover that the car was gone. He contacted security guards and the police, reporting that the car had been stolen.

Shortly after midnight, at approximately 12:45 a.m. on June 8, 2005, Honolulu Police Department (HPD) Officer Edward Hawkins was in a police cruiser at Wai'anae Mall, employing a laser device to identify and stop drivers speeding on Farrington Highway. Using the laser device, he observed a car traveling sixty miles an hour in a thirty-five mile-per-hour zone. Officer Hawkins pursued the car and activated his cruiser's blue lights and siren, and the car pulled over immediately. Officer Hawkins exited the cruiser and approached the car to find Lopez behind the wheel. Lopez provided his Washington State driver's license but was unable to produce either the vehicle's registration certificate or any proof of insurance. Lopez stated that the car belonged to a friend and that he did not know where the paperwork was located.

Officer Hawkins instructed Lopez to turn off the vehicle's ignition and, in response, Lopez retrieved what appeared to be a house key from his pocket, put his hands underneath a towel on the steering column for fifteen to twenty seconds, and turned off the ignition. Deeming the towel suspicious, Officer Hawkins called dispatch, ran a check on the vehicle's license plate number, and was informed by dispatch that the car was stolen. The officer ordered Lopez out of the car, handcuffed him, and placed him under arrest for driving a stolen vehicle. The record does not reflect whether Officer Hawkins, or any other police officer, administered warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), during or after the arrest. Officer Hawkins processed the car, removing the towel and observing that all of the plastic around the steering column was gone, such that he could see its internal mechanisms. HPD Officer Kepi Visoria, who assisted in processing the car, noticed that the ignition was broken and dangling and that the door locks had been "punched," which means that the locks had been shoved in with a blunt object, such as a screwdriver, in order to open the doors.

The police returned the car to Harris, whereupon he noticed that, in addition to the other damage, the compact discs, the sound system, and Harris's wallet were missing, and a door window was "flexed," which is a method by which a person breaks into a car by flexing a window so that he can place his hand through the window and open the door. Harris never gave Lopez, or anyone else, permission to drive the car at any time, and Gregory and Mona, the vehicle's owners, likewise never authorized Lopez, or anyone other than Harris, to drive the car.

### 2. Proceedings in the circuit court

#### a. Charging

On June 17, 2005, Lopez was charged by complaint with intentionally or knowingly exerting unauthorized control over a propelled vehicle, by operating the vehicle without the consent of Gregory and/or Mona, the owners of the vehicle, thereby committing the offense of unauthorized control of a propelled vehicle, in violation of HRS § 708–836, *see supra* note 3.

#### b. Trial

At the February 1, 2006 trial, the prosecution called Harris, Gregory, Mona, and Officers Hawkins and Visoria as witnesses during its case-in-chief. On cross-examination by Lopez, Officer Hawkins affirmed that, when he stopped Lopez for speeding, Lopez was calm and cooperative and that, when he asked for Lopez's license, registration, and insurance, Lopez told him that "the car be-

longs to a friend and he doesn't know where the paperwork is." On redirect examination by the prosecution, the officer testified that Lopez did not volunteer his friend's name or address or the means by which he acquired control of the car from his friend. The deputy prosecuting attorney (DPA) asked, "Did he say anything at all about this friend except [']well, I got it from a friend, I don't know where the paperwork is[']?," to which Officer Hawkins responded, "That's all he said." On recross-examination, the officer admitted that he could not recall whether he had asked Lopez for his friend's name and other pertinent information.

After the prosecution rested, Lopez testified on direct examination that he had grown up in Hawai'i and, in June 2005, he had returned to the islands from Seattle to visit friends and family for a couple of weeks. He acquired the Honda from a friend, Greg Ramba, an automotive mechanic who he had known for approximately two years. When Lopez arrived at Ramba's house, he noticed four or five cars parked in the driveway. Ramba offered to let Lopez use one during his two-week stay. Lopez observed that the car's exterior was damaged in the front, that its interior was very dirty and filled with rubbish, that its steering column was missing and covered by a towel, and that its ignition was broken, but he did not notice that the door locks were punched in. Lopez believed that the car was abandoned but did not find its poor condition suspicious because Ramba was simply a "broke mechanic." Ramba gave Lopez a key to the car. Lopez testified that he did not know that the car was stolen until he was pulled over by Officer Hawkins.

On cross-examination, Lopez admitted that he had neither seen nor asked to see any paperwork for the car and that the car key he received from Ramba was not the actual key to the car, because it looked like a house key. When questioned about Ramba, Lopez claimed that Ramba was twenty-six years old, unmarried, law abiding and honest and that he lived with his parents in Makakilo. Lopez could not, however, remember Ramba's precise address. Lopez maintained that he believed that the car belonged to Ramba or Ramba's family, because the car was in

Ramba's driveway and because he had observed Ramba's family members driving the car. Lopez used the car for two days before he was arrested.

### c. Jury instructions

Lopez requested that the circuit court instruct the jury on the mistake-of-fact defense, as set forth in HRS § 702–218(1), *see supra* note 2, as follows:

### [LOPEZ'S] PROPOSED JURY INSTRUCTION NO. 1

In any prosecution for an offense, it is a defense that the Defendant engaged in the prohibited conduct under ignorance or mistake of fact if the ignorance or mistake negates the state of mind required to establish an element of the offense.

Thus, for example, a person is provided a defense to a charge based on an intentional or knowing state of mind, if the person is mistaken (either reasonably, negligently, or recklessly) as to a fact that negates the person's state of mind required to establish an element of the offense.

The burden is upon the prosecution to prove beyond a reasonable doubt that the Defendant was not ignorant or mistaken as to a fact that negates the state of mind required to establish an element of the offense. If the prosecution fails to meet its burden, then you must find the Defendant not guilty.

This instruction tracks Hawai'i Jury Instruction Criminal (HAWJIC) No. 7.13, *available at* http://www.courts.state.hi.us/attachment/5 D6FD371721EB8CBEC4445E53C/crimjury instruct.pdf (last visited Dec. 28, 2007). The circuit court declined to give the instruction, citing *State v. Palisbo*, 93 Hawai'i 344, 3 P.3d 510 (App.2000), and reasoning that there was "no evidence showing that [an] actual registered owner, either [Gregory or Mona], or an agent thereof, [Harris], gave permission to [Lopez;] in fact, that [possibility] was specifically rejected by the defense [and by Lopez's] testimony, and, therefore, that instruction is not supported by the evidence."

The prosecution asked the circuit court give the following instructions in light of *Palisbo:*

[THE PROSECUTION'S]
INSTRUCTION NO. 3

It is not a defense to the offense of Unauthorized Control of Propelled Vehicle that the Defendant may have received permission to operate the vehicle from another person, unless that person was either the vehicle's registered owner or the agent of the registered owner with either actual or apparent authority to authorize such use.

(Formatting altered.) The prosecution argued that the circuit court should give its instruction because, under *Palisbo,* the prosecution is only required to prove knowing operation of the automobile without the consent of the registered owners and that, although the defendant may have been mistaken in his belief that the person who authorized his use of the vehicle was the vehicle's true owner, he is nevertheless subject to criminal liability. According to the prosecution, *Palisbo* "turns [the authorization] element into an element of strict liability." The circuit court declined to give the prosecution's instruction, because it was confusing and not required under *Palisbo.*

d. *Closing and rebuttal argument*

During closing argument, the DPA, over the objections of the deputy public defender [hereinafter, "defense counsel" or "DPD"], commented on Lopez's post-arrest silence:

[DPA:] Again, consult your own reason and common sense, you come up with a story, you know, that you think might work. ["]Oh, I cannot find it[;] it's my friend's car.["] Yeah, he does say that. Okay. Does he say anything more? Bear in mind within minutes he's out of that car in cuffs being arrested for driving that stolen car[,] right? Did he say anything more? The cop told you he didn't say what his friend's name was, didn't say the address or didn't say anything about the details, didn't say nothing.

Again, you consult your own reason and common sense about how people

normally act. A person is stopped in a stolen car and he really is innocent, what's the first thing he's going to do? ["]Hey, wait a minute, wait a minute—["]

[DPD]: Your Honor, I'm sorry, I'm going to object[,] commenting on the defendant's right to remain silent.

[DPA]: It's in evidence, Your Honor.

[Court]: Overruled. You may continue.

[DPA]: ["]Wait a minute, wait a minute, I got it from my friend Greg Ramba, he lives in Makakilo, he fixes cars, he told me I could drive it, wait, wait, wait.["] Again, think, you're all adults here, you know how people react to things. That's what an innocent person would do[;] he didn't do anything like that. He got cuffed, he got arrested, he got taken away. Why? Because he got caught red-handed and he knew it. That's why.

Defense counsel responded in his closing argument:

[DPD]: .... [Lopez] was telling you the truth, he was telling you the truth.

You know, ... [Lopez's] actions on ... the day he was arrested matter, too....

He doesn't know the car is stolen, he doesn't know there's anything wrong with the car, you know. He does tell the police it's his friend's car. And, you know, the officer himself says[, "W]ell, I can't remember if I asked him anything more about the friend.["] So, you know, [the DPA] is making a big deal about [Lopez] not saying[, "M]y friend is this, he lives there, he lives there.["] We don't know if he did or he didn't[;] the officer himself doesn't know. [Lopez's] actions on that day matter.

On rebuttal, the DPA replied:

[DPA]: Well, the officer didn't ask him, that's why he didn't say anything about the friend's name, where he could be found, the details of the car, et cetera. Again, use your common sense. The [prosecution's] position is that the officer wouldn't need to ask[;] an innocent person would just start talking and try to convince the person arresting him that

he didn't do it and here's why. I mean, don't you think [that the first thing] a reasonable person would have said [is], ... ["]I got it from my friend, Greg Ramba, brah, go talk to him, he'll tell you["]? Nothing like that.

■ In addition, during closing argument, the DPA, over defense counsel's objections, commented on Lopez's failure to call Ramba during trial:

> [DPA:] What the defense is going to argue is he didn't know, he didn't really know because he didn't know the car was stolen and he thought his friend Greg gave him permission to drive the car. Okay. So let's look more closely at that because that's really sort of the nub of this case. All right?
>
> First of all, bear in mind trials are all about evidence, yeah, evidence. What's the evidence for that? [Lopez's] testimony. That's it, that's all you have.
>
> [DPD]: Objection, Your Honor, burden shifting.
>
> [Court]: Overruled.
>
> [DPA]: All you have on this, his testimony that he borrowed the car, that he didn't know it was stolen, et cetera. There's not one single bit of corroboration for what he told you in this case, not a single bit.
>
> [DPD]: Same objection, Your Honor.
>
> [Court]: Overruled.

During rebuttal argument, the DPA, again over defense counsel's objections, returned to the same theme:

> [DPA]: And, by the way, this Greg Ramba—now it's true, you know, the defense doesn't have a burden, he didn't have to testify, he doesn't have to call witnesses. But he has a right to do so and he can put on any evidence he wants. As I said, the evidence for his story is just that, his story. Zero corroboration.

Wouldn't you have liked to have heard from Greg?

> [DPD]: Objection, Your Honor, again burden shifting.
>
> [Court]: Overruled.
>
> [DPA]: Wouldn't you have liked to have heard from Greg Ramba? He says he's a local boy, lives [in] Makakilo with his family. You know, would it have been so hard to get him ... into court to tell you guys[, "Y]eah I lent him the car, I told him it was okay, and I neva know it was stolen either["]? He himself said Greg is law abiding, honest, his friend. You know, don't you think his friend would come in? And all he would have to say is[, "Y]eah, I lent him the car.["] I would probably vote not guilty maybe at that point.[4]
>
> Why didn't he do that? I suggest to you one of two possibilities: There is no Greg Ramba or Greg Ramba would have come in here if he called him and said something very different from what he would have wanted Greg to say.
>
> [DPD]: Objection, Your Honor, that calls for speculation.
>
> [Court]: Overruled.

### e. Judgment and notice of appeal

The jury found Lopez guilty of the charged offense of unauthorized control of a propelled vehicle. The circuit court sentenced Lopez to an indeterminate five-year term of imprisonment, subject to a mandatory minimum term of five years as a repeat offender, entering its judgment of conviction and sentence on May 9, 2006. Lopez filed a timely notice of appeal on June 8, 2006.

### 3. Appellate proceedings

In his opening brief, Lopez argued that the circuit court erred by refusing to give his proposed instruction on the mistake-of-fact defense and by overruling his objections to

---

4. "Prosecutors are bound to refrain from expressing their personal views as to the defendant's guilt...." State v. Marsh, 68 Haw. 659, 660–61, 728 P.2d 1301, 1302 (1986) (holding that the prosecutor improperly expressed his personal opinion that the defendant was guilty, asserting, "I'm sure she committed the crime"); see also

State v. Valdivia, 95 Hawaiʻi 465, 484, 24 P.3d 661, 680 (2001). Because Lopez does not argue that the DPA improperly gave his personal opinion by commenting on how he would have voted under the circumstances, the issue need not be addressed here.

the prosecution's remarks regarding his failure to call Ramba at trial and his post-arrest silence. Relying on *Palisbo* and the legislative history underlying HRS § 708–836, the ICA concluded that the circuit court correctly declined to give the mistake-of-fact instruction, because "the only factual mistake that would absolve Lopez of liability for the offense charged would be a mistaken belief that the registered owners of the vehicle, the Gittens[es], had authorized Lopez's use of the Honda" and Lopez made no such claim. ICA's *Lopez* mem. op. at 7. The ICA also concluded that the prosecution's closing argument legitimately commented on the evidence and drew reasonable inferences therefrom. *Id.* at 10.

The ICA entered its judgment on appeal on September 10, 2007, and Lopez filed his timely application on December 7, 2007.

### B. *Background In Mainaaupo*

#### 1. *Factual background*

In June 2005, Nancy Cordova was the registered owner of a 1991 Nissan Maxima four-door sedan. On the night of June 4, 2005, at approximately 8:00 p.m., Cordova and her boyfriend, Brian Cornel, parked the car at Pupukea Beach Park, located on the North Shore of O'ahu, locked the car, and went scuba diving at Shark's Cove. When they returned to the parking lot at around 9:00 p.m., the car was gone, so they called the police.

Two days later, in the Wai'anae area of O'ahu, Cornel observed Mainaaupo driving what appeared to be Cordova's car, so he followed Mainaaupo to a nearby store, whereupon Mainaaupo exited the car, locked the door with a shortened, three-quarters-of-an-inch-long key, and entered the store. Cornel called the police and, when HPD Officer George Martin arrived, informed the officer that Mainaaupo was in the store. Officer Martin entered the store and arrested Mainaaupo for unauthorized control of a propelled vehicle. Officer Martin determined that Mainaaupo's key, which was not a standard vehicle ignition key, could start the car because, in some vehicles that are over ten years old—like Cordova's 1991 Nissan—the ignition tends to become worn out, so that any key will start the vehicles.

The car was in about the same condition as when Cordova had last seen it on June 4, 2005; no items were missing, and the locks, doors, and ignition remained undamaged. Cordova did, however, discover that a few of the couple's personal items—an underwater camera case, towels, clothes, footwear, a purse, a wallet, and a backpack—had been taken from the seating area and placed in the trunk. Cordova did not at any time give Mainaaupo, or anyone other than Cornel, authority to drive the car, and Cornel did not at any time give Mainaaupo, or anyone else, permission to drive the car either.

#### 2. *Proceedings in the circuit court*

##### a. *Charging*

On June 14, 2005, Mainaaupo was charged by complaint with intentionally or knowingly exerting unauthorized control over a propelled vehicle by operating the vehicle without the consent of Cordova, the owner of the vehicle, thereby committing the offense of unauthorized control of a propelled vehicle, in violation of HRS § 708–836, *see supra* note 3.

##### b. *Trial*

In the course of its case-in-chief, the prosecution called Cordova, Cornel, and Officer Martin. After the prosecution rested, Mainaaupo testified that, on June 3, 2005, he was a passenger on a bus traveling toward his brother's house in Wai'anae, when he noticed his friend "Doug," a fellow passenger, whom he had known for three to six months. Although he claimed to have previously socialized with Doug at Shark's Cove, Mainaaupo could not recall Doug's last name. Because Mainaaupo believed that Doug owned a car, he asked him why he was catching the bus, to which Doug responded by handing Mainaaupo a long, silver key from his pocket. Mainaaupo asked what the key was for, and Doug said, "[F]or my car[;] I don't need it[.] I [am] joining the military[,] and I'll be back in three months." Mainaaupo testified that he believed that the key belonged to Doug and that the key would start Doug's car.

Mainaaupo also testified that, on June 4, 2005, he called Doug, who told him that the car was located at Shark's Cove but did not disclose its make, model, or color. At around 5:00 p.m., Mainaaupo traveled to Shark's Cove, where he observed a number of cars in the parking lot, such that he could not determine which car belonged to Doug. Consequently, Mainaaupo waited by the bathroom and, at around 7:30 p.m., he returned to the parking lot to see only one car, Cordova's car, remaining. Mainaaupo successfully unlocked the car's doors with the key and, accordingly, concluded that the car belonged to Doug and that he had Doug's permission to use the car. He drove the car to his brother's house.

Mainaaupo further asserted that, at around noon on June 6, 2005, he was driving to the store where he was later arrested, when he heard a cellular phone ringing in the back seat. He noticed other items in the back seat, so he placed all of them in the trunk of the vehicle for safekeeping until Doug returned.

### c. Jury instructions

Mainaaupo requested that the circuit court give the following mistake-of-fact instruction, which tracks the language of HAWJIC No. 7.13:

### [MAINAAUPO'S] REQUESTED JURY INSTRUCTION NO. 2

In any prosecution for an offense, it is a defense that the Defendant engaged in the prohibited conduct under ignorance or mistake of fact if the ignorance or mistake negates the state of mind required to establish an element of the offense.

Thus, for example, a person is provided a defense to a charge based on a intentional or knowing state of mind, if the person is mistaken either reasonably, negligently, or recklessly, as to a fact that negates the person's state of mind required to establish an element of the offense; however, a reckless mistake would not afford a defense to a charge based on a reckless state of mind.

The burden is upon the prosecution to prove beyond a reasonable doubt that the Defendant was not ignorant or mistaken as to a fact that negates the state of mind required to establish an element of the offense. If the prosecution fails to meet its burden, then you must find the Defendant not guilty.

Mainaaupo attempted to distinguish *Palisbo*, arguing that that decision did not, in fact, hold a defendant strictly liable under the authorization element of HRS § 708–836. The circuit court declined to give the instruction, citing *Palisbo*.

For its part, the prosecution requested that the circuit court give the following instruction, relying on *Palisbo*: "[PROSECUTION'S] INSTRUCTION NO. 7[:] Under the law relating to the offense of 'unauthorized control of propelled vehicle[,]' [ ] a non-owner driver of a vehicle has a legal duty to obtain consent to operate the vehicle directly from the registered owner of the vehicle." (Formatting altered.) The circuit court gave this instruction over Mainaaupo's objection.

### d. Judgment and notice of appeal

The jury found Mainaaupo guilty as charged, and the circuit court sentenced him to a five-year term of probation. The circuit court entered its judgment on January 18, 2006, and Mainaaupo filed his timely notice of appeal on February 15, 2006.

### 3. Appellate proceedings

In his opening brief, Mainaaupo argued that the circuit court erred in declining to give his mistake-of-fact jury instruction and by giving Prosecution's Proposed Instruction No. 7. The ICA disagreed, relying, as it did in *Lopez*, primarily on *Palisbo* and the legislative history underlying HRS § 708–836. The ICA expressly concluded that the circuit court did not err in declining to give the mistake-of-fact instruction and implicitly concluded that the circuit court was not remiss in giving Prosecution's Proposed Instruction No. 7. ICA's *Mainaaupo* mem. op. at 6–8. Accordingly, the ICA affirmed Mainaaupo's conviction and probationary sentence. *Id.* at 8.

Associate Judge Craig H. Nakamura dissented [hereinafter, "Nakamura dissent"],

reasoning that, although the circuit court's instructions were correct under *Palisbo*, he disagreed with the holding in *Palisbo* because he believed that the mistake-of-fact defense *was* available to defendants to refute the authorization element of HRS § 708–836. Nakamura dissent at 1. Judge Nakamura relied on the plain language of the statute, reasoning that:

> The statute requires that the defendant "intentionally or knowingly exert[ed] unauthorized control" over someone else's vehicle. In my view, a defendant cannot intentionally or knowingly exert "unauthorized" control unless the defendant intended or knew that his or her use of a vehicle was *without the owner's consent.* Thus, I believe that under the most natural and common reading of the statutory language, proof that the defendant knew that his or her use of the vehicle was without the owner's consent is required.

*Id.* at 5 (brackets in original). In Judge Nakamura's view, HRS § 702–207 (1993)[5] "provides guidance on how to apply the mental state specified in an offense to its elements" and "creates a presumption that the 'intentionally or knowingly' mental state specified in HRS § 708–836 applies to both the requirement that the defendant exerted control over another's vehicle and the requirement that the defendant engaged in

such act without the consent of the owner." Nakamura dissent at 5–6. Judge Nakamura also noted that the statute's legislative history is contradictory, particularly in light of committee reports related to the 1999 amendments to the statute, and, therefore, argued that the legislative history did not establish that the legislature intended to foreclose the mistake-of-fact defense with respect to defendants charged with a violation of HRS § 708–836. *Id.* at 6–12. Judge Nakamura also concluded that the circuit court undermined Mainaaupo's mistake-of-fact defense by giving Prosecution's Proposed Instruction No. 7. *Id.* at 14.

The ICA's judgment, entered on September 13, 2007, vacated the circuit court's judgment and remanded the case for a new trial. Because this disposition was inconsistent with its memorandum opinion, *see* ICA's *Mainaaupo* mem. op. at 8, the ICA entered an amended judgment on October 8, 2007, which affirmed the circuit court's judgment. Mainaaupo filed his application on December 11, 2007.[6]

## II. STANDARDS OF REVIEW

### A. *Certiorari*

The acceptance or rejection of an application for a writ of certiorari is discretionary.

---

5. HRS § 702–207, entitled "Specified state of mind applies to all elements," provides that "[w]hen the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."

6. In Mainaaupo's application, the Office of the Public Defender requests that this court clarify whether the ninety-day time period, under Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1(a), for filing an application for a writ of certiorari in this court began to run anew when the ICA filed its amended judgment. Although this point is moot, insofar as Mainaaupo filed his application within 90 days of the ICA's original judgment, and the timeliness of his application is thus not in question, we foresee that this issue will probably arise in the future and, therefore, address it here. Under HRAP Rule 40.1, "'where a judgment is amended in a material and substantial respect, the time within which an appeal from such determination may be taken

begins to run from the date of the amendment, although where the amendment relates only to correction of a clerical error, it does not affect the time allowed for appeal.'" *Korsak v. Hawaii Permanente Med. Group*, 94 Hawai'i 297, 304, 12 P.3d 1238, 1245 (2000) (quoting *Interstate Printing Co. v. Dep't. of Revenue*, 236 Neb. 110, 459 N.W.2d 519, 523 (1990)) (ellipses omitted) (interpreting the time period to file an application for certiorari under the former version of HRAP Rule 40.1 and holding that the time period commenced from the ICA's original order denying a motion for reconsideration, because the amended order denying reconsideration only corrected clerical errors). In this case, the ICA's amendment did not simply eliminate clerical errors but, rather, changed the fundamental disposition of this matter from a "vacate and remand" to an affirmance. The amendment, although by no means surprising given the ICA's memorandum opinion affirming the circuit court's judgment, was both material and substantive and, accordingly, we believe that Mainaaupo's time period within which to file his application began to run anew when the ICA filed its amended judgment.

HRS § 602–59(a) (Supp.2007). In deciding whether to accept the application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[ ] or (2) [o]bvious inconsistencies ... with [decisions] of th[is] court, federal decisions, or [the ICA's] own decision[s]" and whether "the magnitude of those errors or inconsistencies dictat[es] the need for further appeal." *Id.* § 602–59(b).

### B. *Jury Instructions*

 " 'The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.' *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000) (quotation and internal quotation marks omitted). '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' *State v. Sua*, 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999) (quoting *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (quotation omitted)) (brackets in original). In other words,

> [e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

> *Id.* (quoting *State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted))."

*State v. Van Dyke*, 101 Hawai'i 377, 383, 69 P.3d 88, 94 (2003) (quoting *State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001)).

### C. *Statutory Interpretation*

 " ' "[T]he interpretation of a statute is a question of law reviewable *de novo*." ' *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) [ (quoting] *Gray v.*

*Admin. Dir. of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997)[ ]) (some brackets added and some in original). . . . Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> . . . .

> *Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) . . . (footnote omitted)."

*Van Dyke*, 101 Hawai'i at 383–84, 69 P.3d at 94–95 (quoting *State v. Rauch*, 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000)) (some ellipses added and some omitted) (brackets omitted) (formatting altered).

> [A]bsent an absurd or unjust result, *see State v. Haugen*, 104 Hawai'i 71, 77, 85 P.3d 178, 184 (2004), this court is bound to give effect to the plain meaning of unambiguous statutory language and may only resort to the use of legislative history when interpreting an ambiguous statute. . . . *Valdivia*, 95 Hawai'i [at] 472, 24 P.3d [at] 668. . . .

*Thompson v. Kyo–Ya Co.*, 112 Hawai'i 472, 475, 146 P.3d 1049, 1052 (2006); *accord Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 261, 141 P.3d 427, 434 (2006); *see also State v. Kupihea*, 98 Hawai'i 196, 206, 46 P.3d 498, 508 (2002) (" '[W]e do not resort to legislative history to cloud a statutory text that is clear.' " (Quoting *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000).)).

### D. *Prosecutorial Misconduct*

 "Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Iuli*, 101 Hawai'i 196, 204, 65 P.3d

143, 151 (2003). "Misconduct of a prosecutor may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial." *Id.*

## III. *DISCUSSION*

A. *The ICA Erred In Concluding That The Circuit Court Correctly Instructed The Jury On The Mistake-of-fact Defense In Lopez And Mainaaupo.*

Lopez and Mainaaupo argue that the circuit court erred by declining to give their respective HRS § 702–218 mistake-of-fact instructions because each claimed a mistaken belief that the person who consented to his use of the vehicle was the registered owner of the vehicle. Mainaaupo also argues that the circuit court erred by giving Prosecution's Jury Instruction No. 7 to the effect that, pursuant to HRS § 708–836, a defendant is subject to a legal duty to obtain consent to operate a vehicle directly from the registered owner of the vehicle. The prosecution argues, and the ICA agreed, that *Palisbo* and the legislative history underlying HRS § 708–836 dictate that the mistake-of-fact defense was not available to either Lopez or Mainaaupo.[7] *See* ICA's *Lopez* mem. op. at 5–8; ICA's *Mainaaupo* mem. op. at 6–8.

### 1. *Palisbo is distinguishable.*

In *Palisbo*, the defendant, Palisbo, testified that his friend, Kanohokula, arrived at Palisbo's home in a van and that Kanohokula indicated that the vehicle belonged to a cousin. 93 Hawai'i at 349, 3 P.3d at 515. At Kanohokula's request, Palisbo drove the vehicle, whereupon the police stopped the van and arrested both Palisbo and Kanohokula. *Id.* The vehicle did not belong to Kanohokula's cousin but was, in fact, stolen. *Id.* at

351, 3 P.3d at 517. Palisbo was charged with unauthorized control of a propelled vehicle, in violation of HRS § 708–836, *id.* at 347, 3 P.3d at 513, and he sought to assert the mistake-of-fact defense at trial, *id.* at 354, 3 P.3d at 520. The circuit court refused to give Palisbo's proposed mistake-of-fact instruction, and he challenged the circuit court's ruling on appeal. *Id.* The *Palisbo* court held that the circuit court correctly declined to give the mistake-of-fact instruction, reasoning that:

> Here, the only factual mistake which would have absolved [Palisbo] from liability under the statute would be a mistaken belief that the owner himself had authorized [the d]efendant's use of the vehicle. [Palisbo] did not adduce evidence suggesting he had obtained the consent of . . . the van's [actual registered] *owner*[ ] to operate it. If [Palisbo] had presented evidence tending to show that he was under the mistaken belief that the owner had authorized him to operate the vehicle, then the jury would have had to be instructed on the mistake of fact defense.
>
> However, [Palisbo's] defense had nothing to do with believing that he himself had the owner's consent. Indeed, on appeal, [Palisbo] maintains that the mistake of fact instruction should have been given since 'he believed that *Kanohokula's* use of the vehicle was lawful.' (Emphasis added.)

*Id.* at 355, 3 P.3d at 521 (emphases in original).

The prosecution relies on the *Palisbo* court's conclusion that, "Here, the only factual mistake which would have absolved [Palisbo] from liability under the statute would be a mistaken belief that the owner himself had authorized [the d]efendant's use of the vehicle." *Id.* In the prosecution's view, the only mistake that could have absolved Lopez or Mainaaupo of liability under HRS § 702–218

---

7. The prosecution's position is difficult to reconcile with its comments during rebuttal argument in *Lopez*. In emphasizing that Lopez had failed to corroborate his defense that he received permission to use the car from Ramba, the DPA remarked that, if Lopez had called Ramba to testify and if Ramba had admitted that he had lent Lopez the car and that he did not know that the car was stolen, then the DPA would perhaps have voted not guilty if given the opportunity. The purpose of such testimony from Ramba

would have been to support and reinforce Lopez's defense that he had been unaware that Ramba was not the vehicle's owner and that he had thus been mistaken as to the identity of the car's true owner. The DPA's implicit concession that he would potentially vote not guilty based on that defense stands in sharp contrast to the stance he took during the settlement of jury instructions that the defense was simply unavailable.

would be a mistaken belief that the true owners of the vehicles had themselves given Lopez and Mainaaupo permission to drive the cars. We do not, however, read *Palisbo* so broadly. The sentence cited by the prosecution is prefaced by the word "here" and proceeds to address the specifics of the case. *See id.* As Lopez and Mainaaupo observe, the defendant in *Palisbo* plainly admitted that he was aware that the person who had authorized his use of the vehicle was not the vehicle's owner but, rather, merely the cousin of the alleged owner. *Id.* at 349, 3 P.3d at 515. Thus, Palisbo did not claim a mistaken belief that he had permission to use the vehicle from the person who owned the car. *See id.* That is, however, precisely the claim advanced in the present matter by both Lopez and Mainaaupo. Therefore, in our view, *Palisbo* simply does not speak to the specific question before us. Putting *Palisbo* aside, we now turn to the plain language of HRS § 702–218.

 2. *The plain language of HRS § 702– 218 dictates that Lopez and Mainaaupo were each entitled to assert the mistake-of-fact defense with respect to the authorization element of HRS § 708–836.*

HRS § 702–218 provides in relevant part that "it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if . . . [t]he ignorance or mistake negatives the state of mind required to establish an element of the offense. . . ." *See supra* note 2 (formatting altered). "The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as . . . [a]re specified by the definition of the offense. . . ." HRS § 702–205 (1993) (formatting altered). In the present matter, Lopez and Mainaaupo were each charged with unauthorized control of a propelled vehicle, in violation of HRS § 708–836, *see supra* note 3, which provides in relevant part that "[a] person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent," HRS § 708–836(1). "Owner" is defined to include

the "registered owner" of the vehicle. *Id.* § 708–836(4). Accordingly, the elements of the relevant iteration of HRS § 708–836 are (1) the person's *conduct* of exerting control over a thing by operating it, (2) the *attendant circumstance* of the thing being "another's" (*i.e.,* the registered owner's) propelled vehicle, and (3) the *attendant circumstance* of the person's control/operation being without the registered owner's consent [hereinafter, "the authorization element"], *see State v. Aiwohi,* 109 Hawai'i 115, 127, 123 P.3d 1210, 1222 (2005) (" '[A]ny circumstances defined in an offense that are neither conduct nor the results of conduct would, by default, constitute attendant circumstances elements of the offense.' " (quoting *State v. Moser,* 107 Hawai'i 159, 172, 111 P.3d 54, 67 (App.2005))); *cf. id.* at 128, 123 P.3d at 1223 (holding that, under the manslaughter statute, the defendant did not recklessly cause the death of another "person," because the attendant circumstance of "personhood" did not exist at the time the defendant engaged in the allegedly culpable conduct of prenatally ingesting methamphetamine, insofar as the defendant's inchoate child, who died after being born, was a fetus at the time of the defendant's proscribed conduct, and "a fetus is not a 'person' within the plain meaning of the statute"); *State v. Valentine,* 93 Hawai'i 199, 207, 998 P.2d 479, 487 (2000) (holding that the elements of a firearm possession statute include the conduct of a person possessing a thing and the attendant circumstance of the thing exhibiting the attributes of a firearm). With respect to the authorization element, Lopez and Mainaaupo each assert a mistaken belief that the person who authorized his use of the vehicle was the registered owner of the vehicle. *Assuming* that HRS § 708– 836's intentional or knowing state of mind applies to the authorization element, an attendant circumstance, *see* HRS § 702–205, the mistake alleged by both Lopez and Mainaaupo would "negative[ ] the state of mind required to establish [the authorization] element of the offense." *See supra* note 2. Thus, the question becomes whether the state of mind specified by the statute applies to the authorization element. We agree with Judge Nakamura that HRS § 702–207 pro-

vides guidance in addressing this question. *See* Nakamura dissent at 5–6.

HRS § 702–207, entitled "Specified state of mind applies to all elements," provides that, "[w]hen the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." The state of mind prescribed by HRS § 708–836 is intent or knowledge, and the statute does not distinguish among its elements. *See supra* note 3. Accordingly, the intentional or knowing state of mind required by HRS § 708–836 applies to the authorization element, unless the statute "plainly appears" to hold that state of mind inapplicable to the authorization element, *see supra* note 4. In our view, HRS § 708–836 does not, on its face, evidence a clear intent to hold its expressly articulated requisite state of mind inapplicable to the authorization element but, on the contrary, provides that a person commits the offense if he "intentionally or knowingly exerts unauthorized control," *see supra* note 3. *See Kalama*, 94 Hawai'i at 66, 8 P.3d at 1230 (holding that the intentional state of mind set forth in an indecent exposure statute applied to all elements of the offense, because "on its face" the statute did not " 'distinguish among [its] elements' " (quoting HRS § 702–207)); *State v. Pone*, 78 Hawai'i 262, 265–66, 892 P.2d 455, 458–59 (1995) (holding that the intentional mind state set forth in a fourth degree criminal property damage statute applied to each of its elements, because "no contrary purpose 'plainly appears' on the face of the statute" (quoting HRS § 702–207)); *In re Doe*, 76 Hawai'i 85, 92, 869 P.2d 1304, 1311 (1994) (holding that, inasmuch as the intentional state of mind is prescribed by a harassment statute and "no contrary purpose 'plainly appears' on the face of the statute," the intentional state of mind "is the requisite state of mind for each of the elements set forth in [the statute]" (quoting HRS § 702–207)). As Judge Nakamura observed, "a defendant cannot intentionally or knowingly exert 'unauthorized' control unless the defendant intended or knew that his or her use of the vehicle was without the owner's consent,"

and, consequently, "under the most natural and common reading of the statutory language, proof that the defendant knew that his or her use of the vehicle was without the owner's consent is required." Nakamura dissent at 5.

Nevertheless, the thrust of the prosecution's argument, in light of its heavy reliance on legislative history, appears to be that a "contrary purpose plainly appears" in the legislative history of HRS § 708–836 sufficient to render the statute's expressly recited state of mind inapplicable to the authorization element. This court may not, however, rely upon a statute's legislative history, unless the statute's language is ambiguous or produces an absurd or unjust result, *see Thompson*, 112 Hawai'i at 475, 146 P.3d at 1052, because, as this court has explained:

> "We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. Even when the court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used."

*State v. Dudoit*, 90 Hawai'i 262, 271, 978 P.2d 700, 709 (1999) (quoting, *inter alia*, *State v. Meyer*, 61 Haw. 74, 77–78, 595 P.2d 288, 291 (1979)) (emphasis omitted); *see also State v. Smith*, 103 Hawai'i 228, 233, 81 P.3d 408, 413 (2003); *State v. Mueller*, 102 Hawai'i 391, 394, 76 P.3d 943, 946 (2003).

The prosecution does not argue, and we do not discern, that the language of HRS § 708–836 is ambiguous with respect to the applicability of the state of mind requirement to the authorization element. *See* ICA's *Lopez* mem. op. at 5–8; ICA's *Mainaaupo* mem. op. at 6–8. To the contrary, the prosecution affirmatively characterizes the statute's "language" as "plain," and, as we mentioned previously, the statute provides that the applicable state of mind for the authorization element is intentional or knowing. *Cf. State v. Klie*, 116 Hawai'i 519, 525, 174 P.3d 358, 364 (2007) (questioning the prosecution's "resort to an examination of the legislative

history" of a street solicitation statute, because "the prosecution did not assert that [the statute] is ambiguous"). Nor has there been any suggestion by the prosecution that a straightforward reading of the statute would yield an absurd or unjust result.

In short, because the language of HRS § 708–836 plainly and unambiguously applies its prescribed state of mind to the authorization element and because a forthright reading of the statute does not appear to produce an absurd or unjust result, we are not at liberty to rely upon legislative history in interpreting the statute, see *Thompson*, 112 Hawai'i at 475, 146 P.3d at 1052, even if the history may show that the legislature " 'really meant and intended something not expressed by the phraseology of the [statute],' " see *Dudoit*, 90 Hawai'i at 271, 978 P.2d at 709 (quoting, *inter alia, Meyer*, 61 Haw. at 77, 595 P.2d at 291); see also *T–Mobile USA, Inc. v. County of Hawai'i Planning Comm'n*, 106 Hawai'i 343, 352–53, 104 P.3d 930, 939–40 (2005) (holding that, inasmuch as this court has previously recognized a statutory term "to be plain and unambiguous, [this court is] not at liberty to look beyond the statute's plain and obvious meaning"); *State v. Yamada*, 99 Hawai'i 542, 552–53, 57 P.3d 467, 477–78 (2002) ("Inasmuch as the statute's language is plain, clear, and unambiguous, our inquiry regarding its interpretation should be at an end."); *Kalama*, 94 Hawai'i at 64, 8 P.3d at 1228 (declining to rely upon the legislative history of an indecent exposure statute in determining whether the statute encompassed nude sunbathing, because the statute was not ambiguous).

 To summarize, because HRS § 708–836 does not "plainly appear" to render its specified state of mind inapplicable to the authorization element, the intentional or knowing states of mind apply to the authorization element. See *supra* note 3; *cf.* Nakamura dissent at 5–6. Consequently, we hold that a defendant prosecuted under HRS § 708–836 may assert the mistake-of-fact defense with respect to the authorization element, where he claims that he mistakenly believed that the person who authorized his operation of the vehicle was the vehicle's registered owner, because such a belief would potentially "negative[ ] the state of mind required to establish [the authorization] element of the offense." See *supra* note 2.

 In this case, Lopez and Mainaaupo requested that the circuit court instruct the jury on the mistake-of-fact defense, because each testified to his belief, which each later realized was mistaken, that the person who consented to his use of the vehicle (Greg Ramba and Doug, respectively) was the registered owner of the vehicle. The prosecution argues that, while Mainaaupo may have testified that Doug gave him permission to use a car, Mainaaupo did not testify that Doug gave him permission to use Cordova's Nissan Maxima in particular and, therefore, whatever permission Mainaaupo may have allegedly received from Doug could not have extended to the operation of Cordova's Nissan Maxima. Nevertheless, Mainaaupo did testify that Doug told him that the car was located at Shark's Cove, that he waited on the evening of June 4, 2005 until only one car remained in the parking lot at Shark's Cove, and that the key he received from Doug unlocked the doors to that car. Thus, although Mainaaupo admitted that Doug did not disclose the make or model of the car, he did articulate the process of elimination by which he attempted to identify the car that he claimed to believe belonged to Doug. However weak Lopez and Mainaaupo's testimony may have been, we think that they were each entitled to have the circuit court give their mistake-of-fact jury instructions. See *State v. Hironaka*, 99 Hawai'i 198, 204, 53 P.3d 806, 812 (2002) (" '[A] defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be.' " (Quoting *State v. Maelega*, 80 Hawai'i 172, 178–79, 907 P.2d 758, 764–65 (1995).). Thus, the circuit court erred in declining to give their requested instructions.

The circuit court did, however, over Mainaaupo's objection, give Prosecution's Proposed Instruction No. 7, which directed that, "[u]nder the law relating to the offense of 'unauthorized control of propelled vehicle[,]'

[ ] a non-owner of a vehicle has a legal duty to obtain consent to operate the vehicle directly from the registered owner of the vehicle." We agree with Judge Nakamura that the instruction essentially mandated that, "[b]ecause the defendant ha[d] the duty of obtaining consent directly from the vehicle's registered owner, the defendant [was] subject to criminal liability if he or she fail[ed] to do so," and, therefore, implied that "it is no defense that the defendant obtained consent from someone the defendant believed was the vehicle's owner if the belief turns out to be wrong." Nakamura dissent at 3. Prosecution's Proposed Instruction No. 7 was both "prejudicial and misleading because it improperly undermined Mainaaupo's mistake-of-fact defense." *Id.* at 14; *see also Van Dyke*, 101 Hawai'i at 383, 69 P.3d at 94. Consequently, the circuit court further erred in giving this instruction to the jury.

■ Because there is a reasonable possibility that the circuit court's erroneous jury instructions contributed to both Lopez's and Mainaaupo's convictions, we vacate the judgments against them and remand their cases for new trials. *See Van Dyke*, 101 Hawai'i at 383, 69 P.3d at 94.

### B. *Lopez's Allegations Of Improper Prosecutorial Comment*

1. *The ICA erred by failing to conclude that the DPA's improper comments on Lopez's post-arrest silence were not harmless beyond a reasonable doubt.*

■ Lopez argues that the prosecution's comments during closing and rebuttal argument regarding his post-arrest silence went beyond legitimate comment on the evidence,

such that he is entitled to a new trial. In evaluating whether improper prosecutorial comment warrants a new trial, we consider the following three factors: " '(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.' " *State v. Hauge*, 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003) (quoting *State v. Pacheco*, 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001)).

#### a. *The nature of the DPA's conduct*

■ Lopez contends that the DPA's remarks during closing and rebuttal argument improperly commented on his post-arrest silence and, therefore, violated his right to remain silent. "There is nothing more basic and more fundamental than that the accused has a constitutional right to remain silent, and the exercise of this privilege may not be used against him." [8] *State v. Alo*, 57 Haw. 418, 424, 558 P.2d 1012, 1016 (1976). Although the record does not reflect whether Lopez received *Miranda* warnings from Officer Hawkins or any other police officer at the time or after he was arrested, we hold that the right against self-incrimination attached at least as of the time of the arrest,[9] "because the right to remain silent derives from the Constitution and not from the *Miranda* warnings themselves." *United States v. Velarde–Gomez*, 269 F.3d 1023, 1029 (9th Cir. 2001) (en banc) (citing *United States v. Whitehead*, 200 F.3d 634 (9th Cir.2000)). "Any other holding would create an incentive for arresting officers to delay interrogation in order to create an intervening 'silence' that would then be used against the defendant." *United States v. Moore*, 104 F.3d 377, 386 (D.C.Cir.1997).[10]

8. The right to remain silent resides in the fifth amendment to the United States Constitution, *see* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."), which applies to the states through the fourteenth amendment, *see Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."), and in article I, section 10 of the Hawai'i Constitution, *see* Haw. Const. art. I, § 10

("[N]or shall any person be compelled in any criminal case to be a witness against oneself.").

9. While the DPA's comments could also be interpreted to refer to Lopez's pre-arrest silence, Lopez does not raise that point on appeal, and, therefore, we do not address it. As an aside, courts are divided on whether the government may comment on a defendant's pre-arrest silence. *See Combs v. Coyle*, 205 F.3d 269, 282 (6th Cir.2000) (collecting cases).

10. *But see United States v. Frazier*, 408 F.3d 1102, 1111 (8th Cir.2005) (concluding that the

Lopez takes issue with the DPA's comments pertaining to what an "innocent person" would have done in Lopez's situation when arrested by Officer Hawkins. The DPA's remarks related to the testimony of Officer Hawkins, who confirmed on cross-examination by defense counsel that, when he stopped Lopez for speeding, Lopez told him, "[T]he car belongs to a friend and he doesn't know where the paperwork is." On redirect examination by the DPA, the officer testified that Lopez did not disclose his friend's name or address or how he might have acquired the car from his friend. The DPA asked, "Did he say anything at all about this friend except [']well, I got it from a friend, I don't know where the paperwork is[']?," to which Officer Hawkins responded, "That's all he said." On recross-examination, the officer admitted that he could not recall whether he asked Lopez for "his friend's name and information like that."

After summarizing Officer Hawkins's testimony during closing argument, the DPA asserted, "A person is stopped in a stolen car and he really is innocent, what's the first thing he's going to do?" Lopez objected on the ground that the DPA's comments offended his right to remain silent, but the DPA countered that Officer Hawkins's testimony was "in evidence," and the circuit court overruled the objection. Continuing, the DPA asserted that an "innocent person" in Lopez's situation would have told Officer Hawkins, "[']Wait a minute, wait a minute, I got it from my friend Greg Ramba, he lives in Makakilo, he fixes cars, he told me I could drive it, wait, wait, wait.[']" During his closing argument, defense counsel raised Officer Hawkins's inability to remember whether he asked Lopez for information regarding his friend, apparently to imply that Lopez did not disclose that information because Officer Hawkins probably did not ask. On rebuttal, the DPA responded that "the officer wouldn't need to ask[;] an innocent person would just start talking and try to convince the person arresting him that he didn't do it," because a "reasonable person" in Lopez's position would have said, "[']I got [the car] from my friend, Greg Ramba, brah, go talk to him, he'll tell you.[']" According to the DPA, Lopez said "[n]othing like that."

The prosecution asserts that defense counsel's questions during his cross-examination of Officer Hawkins regarding what Lopez did say about his friend opened the door to the DPA's inquiry on his redirect examination of the officer with respect to what Lopez did not say. Lopez responds that he takes issue not with the DPA's redirect of the officer but, rather, with the manner in which the DPA *commented* on that evidence during closing and rebuttal argument. The prosecution asserts that the DPA's comments on Officer Hawkins's testimony during closing and rebuttal argument were "entirely proper," because the testimony was "in evidence," and, as such, the DPA could "properly discuss the import of [Lopez's] failure to provide [Officer] Hawkins with his friend's name, address, and other information."

▮▮▮▮▮ Although a prosecutor has wide latitude in commenting on the evidence during closing argument, it is not enough that a his comments are based on testimony "in evidence"; his comments must also be "legitimate." *See State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) ("[A] prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence . . . ." (Citations omitted.)). A pros-

---

prosecution could comment on the defendant's post-arrest, pre-*Miranda* silence because, "[a]lthough [the defendant] was under arrest, there was no governmental action at that point inducing his silence"); *Moore*, 104 F.3d at 395 (Silberman, J., concurring) (asserting that the rationale of *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam)—which held that the government may use the defendant's post-arrest, pre-*Miranda* silence for *impeachment* because, at that point, the defendant has not been assured that his silence will not be used against him—should be extended to the proposition that the government may affirmatively use the defendant's post-arrest, pre-*Miranda* silence as substantive evidence of *guilt* ); *United States v. Rivera*, 944 F.2d 1563, 1567–68 & n. 11 (11th Cir.1991) ("[T]he government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given." (Citing *Fletcher*, 455 U.S. 603, 102 S.Ct. 1309.)).

ecutor's comments are legitimate when they draw "reasonable" inferences from the evidence. *See Iuli,* 101 Hawai'i at 208, 65 P.3d at 155 ("The prosecution is permitted to draw reasonable inferences from the evidence....").

In this case, the DPA's comments were not "legitimate" because, in contravention of Lopez's fundamental right to remain silent, *see Alo,* 57 Haw. at 424, 558 P.2d at 1016, the DPA argued the unreasonable inference that Lopez was guilty in light of his post-arrest silence, that is, his failure to act like an "innocent person" and disclose to Officer Hawkins Ramba's name, address, and occupation. *See Whitehead,* 200 F.3d at 638–39 (holding that the district court erred in permitting the prosecutor to comment on the defendant's post-arrest silence during closing argument by remarking that, after the defendant was arrested, he failed to ask "What is going on here?," "Why I am being treated like this?," and "Why am I being arrested?" and by commenting that "the defendant didn't say a word because he knew"); *United States v. Branson,* 756 F.2d 752, 753–54 (9th Cir.1985) (holding that the prosecutor improperly referred to the defendant's post-arrest silence during closing argument ,by asserting that an "honest person" in the defendant's position would have told the law enforcement officer, "I don't know this was counterfeit, I just got it somehow," and that the defendant refused to tell law enforcement where he received the counterfeit bills); *Scarborough v. Arizona,* 531 F.2d 959, 961 (9th Cir.1976) (finding "fundamental error" where the prosecutor commented during closing argument that the defendant remained silent after he was arrested and that, "if he were arrested for armed robbery, he would have said something—if he were not guilty"); *cf. State v. McCrory,* 104 Hawai'i 203, 208, 87 P.3d 275, 280 (2004) (observing that a defendant "has no affirmative duty to proclaim his innocence").

The prosecution cites two cases in support of its argument that the DPA's comments were "entirely proper," to wit, *Hauge* and *State v. Briggman,* 21 Ill.App.3d 747, 316 N.E.2d 121 (1974). In *Hauge,* this court concluded that, because the defendant under-

took to " 'explain away' much of the prosecution's evidence," he "virtually invited" the prosecutor to cross-examine him and later comment, during rebuttal argument, on his failure to "explain away" the DNA evidence showing that his blood was found at the scene of the crime. 103 Hawai'i at 57, 79 P.3d at 150. In *Briggman,* the Illinois Appellate Court held that, because the defendant volunteered on cross-examination that he had been "smoking reefers" on the night in question, "he assumed the risk that his testimony would be subject to elaboration by cross-examination or comment in closing argument" and, therefore, the prosecutor's comment during closing argument that "he had smoked some reefers" was proper. 316 N.E.2d at 127. While these cases permit prosecutorial comment on issues raised by the defendant, we conclude that they are distinguishable. They do not suggest, much less hold, that a prosecutor may argue to the jury that a defendant's *failure* to disclose facts to the police during and following his arrest may be equated with guilt, which is precisely what the DPA did in the present matter by suggesting that the "import of [Lopez's] failure to provide [Officer] Hawkins with his friend's name, address, or other information," was that Lopez "didn't do" "what an innocent person would do."

In light of the language employed by the DPA, we think that the jury would "naturally and necessarily" interpret his remarks during closing and rebuttal argument as comments on Lopez's post-arrest silence and that the comments are consequently "improper." *See State v. Wakisaka,* 102 Hawai'i 504, 515–16, 78 P.3d 317, 328–29 (2003) (holding that, "given the language used, the jury would naturally and necessarily interpret the prosecution's rebuttal argument as a comment on [the defendant's] failure to testify," where the prosecutor commented during closing argument that the defendant would know certain facts and that, "[i]f he doesn't tell us, we can only look to [the evidence] and see what [the evidence] tells us"); *State v. Vild,* 155 Ariz. 374, 746 P.2d 1304, 1308 (Ct.App.1987) (holding that the prosecutor improperly commented on the defendant's post-arrest silence because, "[w]hile the prosecutor did not flatly state that the [defendant] remained silent after his arrest, his description of what an

innocent person would have said when first informed of his arrest for cocaine-related offenses implied that this is what the [defendant] would have said at the time of his arrest or shortly thereafter if his testimony had been true" (emphasis omitted)).

Accordingly, the ICA erred in concluding that the DPA was legitimately commenting on the evidence and drawing reasonable inferences therefrom. ICA's *Lopez* mem. op at 10. The nature of the DPA's conduct—the first factor—weighs in favor of granting Lopez a new trial. *See Wakisaka,* 102 Hawai'i at 515–16, 78 P.3d at 328–29.

> b. *The promptness of a curative instruction and the strength or weakness of the evidence against Lopez*

 Generally, this court considers "a curative instruction sufficient to cure prosecutorial misconduct because [it] presume[s] that the jury heeds the court's instruction to disregard improper prosecution comments." *Id.* at 516, 78 P.3d at 329. In this case, however, the circuit court declined to give a curative instruction when Lopez objected to the DPA's comments and, instead, overruled the objection. Thus, the circuit court's failure to give any form of curative instruction militates in Lopez's favor. *See id.* (holding that the circuit court's failure to give a curative instruction in response to the prosecution's comment on the defendant's decision not to testify at trial weighed "heavily" in the defendant's favor); *State v. Rogan,* 91 Hawai'i 405, 415, 984 P.2d 1231, 1241 (1999) (concluding that the second factor weighed "heavily" in favor of the defendant, because the circuit court did not give a curative instruction in the wake of the defendant's objection to the prosecutor's "inflammatory" argument).

 Nevertheless, the prosecution argues that the evidence against Lopez was strong because, pursuant to HRS § 708–836, *see supra* note 3, it "only" had to prove that he intentionally or knowingly operated the car without first obtaining Gregory's or Mona's consent and because Lopez admitted those facts. The prosecution's argument rests on the false premise that it was not subject to the burden of proving that Lopez was not mistaken as to the identity of the registered owner. As we explained *supra* in section III.A, we believe that the intentional or knowing state of mind prescribed in HRS § 708–836(1) applies to the authorization element of the offense, such that the prosecution bore the burden of proving that Lopez did not mistakenly believe that the person who authorized his use of the vehicle was the registered owner of the vehicle. Proof of this element turned principally on whether the jury believed Lopez's account of how he acquired the car. Accordingly, under the third factor, we think that the evidence in this case is not so overwhelming that we are convinced that the DPA's intrusion into Lopez's right to remain silent may not have contributed to his conviction. *See Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241 (holding that the evidence against the defendant, which essentially turned on the credibility of the complainant and the defendant, "was not so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's [racial] comments").

 In summary, we hold that all three factors counsel that the DPA's improper comments were not harmless beyond a reasonable doubt and, consequently, that Lopez is entitled to a new trial on remand.[11] *See Wakisaka,* 102 Hawai'i at 516, 78 P.3d at 329 (holding that, because all three factors demonstrated that the prosecution's improper comment on the defendant's failure to testify was not harmless beyond a reasonable doubt, the defendant was entitled to a new trial). The ICA erred insofar as it reached a contrary conclusion.

> 2. *The ICA correctly concluded that the DPA's comments regarding Lopez's failure to call Ramba were not improper.*

 Lopez argues that the DPA's comments during closing and rebuttal argument

---

11. Lopez does not argue, and we do not believe, that the DPA's comments on his post-arrest silence were so egregious that double jeopardy should attach so as to prevent his retrial. *See Wakisaka,* 102 Hawai'i at 516, 78 P.3d at 329 (holding that the prosecutor's improper comment on the defendant's failure to testify was not "so egregious that double jeopardy should attach to prevent retrial"). Indeed, Lopez only requests a new trial.

with respect to Lopez's failure to call Greg Ramba were improper, because they unreasonably implied that Lopez bore the burden of proof.

" 'When it would be natural under the circumstances for a party to call a particular witness, and he fails to do so, tradition has allowed his adversary to use this failure as the basis for invoking an adverse inference.' " *State v. Padilla,* 57 Haw. 150, 160, 552 P.2d 357, 364 (1976) (quoting McCormick, *Evidence* 656–67 (2d ed.1954)). It is "natural" for a party to call a witness when " 'a party has it peculiarly within his power to produce [a] witness[ ] whose testimony would elucidate the transaction.' " 2 Kenneth S. Broun *et al., McCormick on Evidence* 221 (6th ed.2006) (quoting *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)). Under those circumstances, the permissible inference is that, if the witness had been called by the party, the witness's testimony would have been unfavorable to the party. *See id.* In *Padilla,* this court held that, because the *defendant* invoked an adverse inference with respect to the prosecution's failure to call a witness, the prosecution was entitled to explain why it had not done so. 57 Haw. at 161, 552 P.2d at 364. This court has not, however, addressed the question whether the *prosecution* may invoke an adverse inference against the defendant by virtue of his failure to call a witness.[12]

Lopez cites *Ross v. State,* 106 Nev. 924, 803 P.2d 1104 (1990), in which the Nevada Supreme Court held that "[i]t is generally outside the boundaries of proper argument to comment on a defendant's failure to call a witness," because such comment improperly " 'suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence.' " *Id.* at 1105 (quoting *Barron v. State,* 105 Nev. 767, 783 P.2d 444, 451 (1989)). In response, the prosecution quotes several paragraphs from *Napulou,* which include a citation to *United States v. Bautista,* 23 F.3d 726 (2d Cir.1994), a decision upon which Lopez also relies, apparently for a fall-back position in the event that this court declines to follow *Ross.* In *Bautista,* the United States Court of Appeals for the Second Circuit observed that "the government may comment on a defendant's failure to call witnesses to support his factual theories," but "may not … go further and suggest that the defendant has the burden of producing evidence." *Id.* at 733.

▮ Unlike the *Ross* court's relatively hard and fast rule against commenting on the defendant's failure to call witness, the *Bautista* court's approach permits such comment to the extent that it does not impermissibly shift the burden of proof to the defendant. *See id.* We believe that the more flexible rule in *Bautista* is consistent with the "wide

12. In *State v. Napulou,* 85 Hawai'i 49, 936 P.2d 1297 (App.1997), the ICA held that, where a defendant relies on an alibi defense and presents some evidence concerning the alibi, he opens the door to prosecutorial comment on "the state of the evidence, [the defendant's] failure to call logical witnesses, and/or [the defendant's failure to] present material evidence." *Id.* at 49, 59, 936 P.2d at 1307. This court discussed *Napulou* in *Hauge.*

In *Hauge,* the prosecution adduced DNA evidence showing that the defendant's blood was found at the scene of the crime. 103 Hawai'i at 45–46, 79 P.3d at 138–39. The defendant testified that the blood found at the scene was not his but, on cross-examination, admitted that his testimony was inconsistent with the DNA evidence. *Id.* at 54, 79 P.3d at 147. During closing argument, the prosecution asserted, " 'He explained away everything except the most important evidence of all. He could not explain away why the D.N.A. evidence pinpointed him inside that room.' " *Id.* at 139, 79 P.3d at 46. On appeal, the defendant argued that the prosecutor's comments were improper, distinguishing *Napulou* on the ground that the defendant in that case asserted an alibi defense, whereas he did not assert an alibi defense. *Id.* at 55, 79 P.3d at 148. This court held that, although the defendant did not raise an alibi defense, he did undertake to "explain away" much of the prosecution's evidence and, consequently, opened the door to the prosecution's cross-examination and later " 'comment on the state of the evidence.' " *Id.* at 57, 79 P.3d at 150 (quoting *Napulou,* 85 Hawai'i at 59, 936 P.2d at 1307).

In our view, *Hauge* only adopted *Napulou* insofar as *Napulou* held that, if a defendant adduces evidence at trial, the prosecution may comment on the evidence during closing argument. *See id. Hauge* did not address *Napulou's* rule that the prosecution may comment on the defendant's failure to call a witness, because the missing witness issue was not before this court. Thus, this court has not addressed whether the *prosecution* may invoke an adverse inference by virtue of the defendant's failure to call a logical witness.

latitude" that this court affords prosecutors when they comment on evidence. *See Clark*, 83 Hawai'i at 304, 926 P.2d at 209. At the same time, the rule also safeguards the defendant's right to require the prosecution to shoulder the burden of proving guilt beyond a reasonable doubt. *See State v. Murray*, 116 Hawai'i 3, 10, 169 P.3d 955, 962 (2007) ("The defendant's right to have each element of an offense proven beyond a reasonable doubt is a constitutionally and statutorily protected right."); *Hauge*, 103 Hawai'i at 55–56, 79 P.3d at 148–49 ("[E]fforts by the prosecution to shift the burden of proof onto a defendant are improper and implicate the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai['i Constitution."). Because we believe that the *Bautista* rule strikes a fair balance between the interests of both the prosecution and the defense, we adopt it and conclude that the prosecution may invoke the adverse inference against the defendant for his failure to call a witness "[w]hen it would be natural under the circumstances for [the defendant] to call [the] witness," *Padilla*, 57 Haw. at 160, 552 P.2d at 364 (quoting McCormick, *Evidence* 656–67), and when the comments do not "suggest[ ] to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence," *Bautista*, 23 F.3d at 733.

In the present matter, Lopez does not dispute that it would have been natural for him to call Ramba but, instead, maintains that the DPA's comments on his testimony impermissibly implied that he bore the burden of proof. At trial, Lopez testified that Ramba was a friend, law abiding, and honest. Consequently, during rebuttal argument, the DPA argued as follows:

> Wouldn't you have liked to have heard from Greg Ramba? [Lopez] says he's a local boy, lives [in] Makakilo with his family. You know, would it have been so hard to get him in here into court to tell you guys[, "Y]eah, I lent him the car, I told him it was okay, and I neva know it was stolen either["]? [Lopez] himself said Greg is law abiding, honest, his friend. You know, don't you think his friend would

come in? And all he would have to say is[, "Y]eah, I lent him the car.["] I would probably vote not guilty maybe at that point.[13]

> Why didn't he do that? I suggest to you one of two possibilities: There is no Greg Ramba or Greg Ramba would have come in here if he called him and said something very different from what [Lopez] would have wanted Greg to say.

Lopez argues that the DPA shifted the burden of proof by repeatedly referring to his failure to call Ramba and by asserting that, had he called Ramba, Ramba's testimony would have been unfavorable. The DPA's comments on Lopez's failure to call Ramba and Ramba's potentially unfavorable testimony did not, however, shift the burden of proof. *See United States v. Caccia*, 122 F.3d 136, 140 (2d Cir.1997) (holding that a jury instruction that permits "the jury to draw an adverse inference against [the defendant] for his failure to call an available material witness" does not deprive him of his "right to have the prosecution bear the burden of proof as to all elements of the crime"). Lopez further argues that the DPA suggested to the jury that "Lopez *deliberately withheld* Ramba from the jury because Ramba would have said 'said something very different from what [Lopez] would have wanted Greg [Ramba] to say.'" (Emphasis added.) (Brackets in original.) The record does not, however, reflect that the DPA asserted, or even implied, that Lopez was deliberately withholding Ramba from the jury. To be sure, the DPA's comments suggest that Lopez made a strategic decision not to call Ramba, but they do not, in our view, insinuate foul-play on Lopez's part.

▪▪▪ Lopez next asserts that the DPA shifted the burden of proof by arguing that, if Lopez had called Ramba and Ramba had provided favorable testimony, the DPA would perhaps vote not guilty. According to Lopez, the DPA implied that, "because Ramba did not testify, Lopez *must* be found guilty." (Emphasis added.) It is true that the prosecution may not expressly or impliedly assert that the defendant's failure to call a witness

13. *See supra* note 4.

258

obligates the jury to find the defendant guilty. *Cf. United States v. Mares,* 940 F.2d 455, 461 (9th Cir.1991) (holding that a prosecutor's comments to the jury did not shift the burden of proof, because the prosecutor simply stated that, if the defense failed to mention or adequately explain unfavorable facts, "ask yourselves why" and because "[t]he prosecutor did not argue that a failure to explain [the uncomfortable facts] adequately required a guilty verdict"); *Bautista,* 23 F.3d at 733 (observing that "prosecutors should avoid statements suggesting that the defense is 'obligated' at any time 'to come forward with evidence' "). Nevertheless, we do not think that the prosecution made that argument here. The DPA's precise language was that, if Lopez had called Ramba to testify and Ramba provided favorable testimony, the DPA "would probably vote not guilty maybe at that point." In our view, this statement implies that, because Lopez did not call Ramba, the DPA would likely vote guilty. Although the DPA should have refrained from interjecting his personal opinion on Lopez's guilt by suggesting how he would vote if he were a juror, *see supra* note 4, an issue that was not raised on appeal or in the proceedings below, we do not believe that he implied, as Lopez suggests, that Lopez's failure to call Ramba *required* the jury to return a guilty verdict, *see Mares,* 940 F.2d at 461. Accordingly, we do not perceive that the DPA's comments regarding how he would vote shifted the burden of proof to Lopez.

■ Finally, Lopez contends that the DPA inappropriately implied that Ramba did not exist by virtue of Lopez's failure to call him as a witness. The inference that Ramba did not exist falls within the realm of reasonable inferences that the DPA was permitted to draw from the evidence adduced at trial, especially given Lopez's inability to recall Ramba's home address, despite the fact that he had allegedly been to Ramba's house and had known him for two years. *See Iuli,* 101 Hawai'i at 208, 65 P.3d at 155; *Alston v. United States,* 552 A.2d 526, 528 (D.C.App. 1992) (holding that the prosecutor properly commented during closing argument that the person who allegedly gave the defendant permission to use a stolen automobile did not exist, because that theory "could reasonably be inferred from the evidence adduced at trial," such as defendant's testimony that he did not know the person's last name).

Accordingly, we do not believe that the DPA's comments regarding Lopez's failure to call Ramba were improper and, consequently, we do not address whether they were harmless beyond a reasonable doubt. *See Valdivia,* 95 Hawai'i at 483, 24 P.3d at 679 ("[W]e hold that the [prosecutor's] statement did not constitute prosecutorial misconduct in the first instance and need not reach the question whether it was harmless beyond a reasonable doubt."). The ICA was correct on this issue. *See* ICA's *Lopez* mem. op. at 10.

## IV. CONCLUSION

For the foregoing reasons, we vacate Lopez and Mainaaupo's convictions and remand their cases for new trials.

Concurring and Dissenting Opinion by ACOBA, J.

I concur, except I believe that the comments by Plaintiff–Appellee–Respondent State of Hawai'i (the prosecution) in closing argument did impermissibly shift the burden of proof in the case of Defendant–Appellant–Petitioner Mark K. Lopez (Lopez) even under the rule set forth in *United States v. Bautista,* 23 F.3d 726, 733 (2d Cir.1994), (noting that while "the government may comment on a defendant's failure to call witnesses to support his factual theories[,]" it "may not . . . go further and suggest that the defendant has the burden of producing evidence" (citations omitted)) adopted by the majority. *See* majority opinion at 257, 178 P.3d at 23 (holding that "[t]he [prosecution's] comments on Lopez's failure to call [Greg Ramba (Ramba) ] and Ramba's potentially unfavorable testimony did not, however, shift the burden of proof" (citation omitted)).

Whatever the nature of the instructional dispute concerning the mistake of fact defense, Lopez did present testimony that he believed Ramba was the rightful owner of the stolen vehicle and the prosecution attacked the credibility of this testimony. Tak-

en as a whole, the prosecution's comments suggested that in order to obtain an acquittal, Lopez was required to produce evidence proving that he did not possess the requisite mental state to commit Unauthorized Control of a Propelled Vehicle. Because Lopez's case is remanded, I believe it would be prejudicial if a similar argument were made on remand. Thus, I respectfully disagree with the majority's conclusion on this issue.

### I.

The challenged portion of the prosecution's rebuttal argument, to which Lopez objected at trial, attempted to discredit Lopez's defense by emphasizing the absence of testimony by Ramba to the effect that Ramba had loaned Lopez the stolen vehicle. The prosecution argued that Lopez's testimony of his purported belief that he had the owner's permission to use the car was insufficient and that Lopez should have produced Ramba as a witness for the jury to hear before the prosecutor himself, presumably in his own mind, would "probably vote not guilty."

All you have on this, his testimony that he borrowed the car, that he didn't know it was stolen, et cetera. *There's not one single bit of corroboration for what he told you in this case, not a single bit.*

. . . .

. . . And, by the way, this [Ramba]—now it's true, you know *the defense doesn't have a burden, he [presumably, Lopez] didn't have to testify, he doesn't have to call witnesses.* But he has a right to do so and he can put on any evidence he wants. As I said, the evidence for his story is just that, his story. *Zero corroboration. Wouldn't you have liked to have heard from [Ramba]?*

. . . .

. . . Wouldn't you have liked to have heard from [Ramba]? [Lopez] says [Ramba is] a local boy, lives in Makakilo with his family. *You know, would it have been so hard to get him in here to court to tell you guys[, "Y]eah, I lent him the car, I told him it was ok, and I neva [sic] know it was stolen either["]?* [Lopez] himself said [Ramba] is a[sic] law abiding, honest, his friend. *You know, don't you think his*

*friend would come in? And all he would have to say is[, "Y]eah, I lent him the car.["] I would probably vote not guilty maybe at that point.*

Why didn't he do that? I suggest to you one of two possibilities: There is no [Ramba] or [Ramba] would have come in here if [Lopez] called him and said something very different from what he would have wanted [Ramba] to say.

(Some emphases added.)

Simply pointing out that the defendant's testimony is uncorroborated is permissible comment on the state of the evidence. *See State v. Hauge*, 103 Hawai'i 38, 55, 79 P.3d 131, 148 (2003) (explaining that "the prosecution may 'comment on the state of the evidence, the defendant's failure to call logical witnesses, and/or to present material evidence . . . without shifting the burden of proof to the defendant'" (quoting *State v. Napulou*, 85 Hawai'i 49, 59, 936 P.2d 1297, 1307 (App.1997) (brackets omitted) (ellipsis in original))). However, *Bautista* explained, as noted previously, that although the prosecutor "may comment on a defendant's failure to call witnesses to support his factual theories," he may not "suggest that the defendant has the burden of producing evidence." *Bautista*, 23 F.3d at 733 (citations omitted). In *Bautista*, the Second Circuit Court of Appeals held that the following portion of the prosecutor's summation did not constitute prosecutorial misconduct: "The defense does not have a burden of proving anything to you but when they do make an argument to you . . . you don't have to accept it. *At that point they are obligated to come forward with evidence.*" *Id.* (emphasis added). It explained that "[t]he challenged statement, although inapt, when considered in context *would not have been understood by a reasonable jury as anything more than an argument that the jury need not believe uncorroborated defense theories.*" *Id.* (footnote omitted) (emphasis added).

### II.

It is axiomatic that the prosecution is charged with the burden of proving all elements of a charged crime beyond a reason-

able doubt in order to obtain a conviction. *State v. Iosefa,* 77 Hawai'i 177, 182, 880 P.2d 1224, 1229 (App.1994) (noting that "[i]t is ... well-settled that the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution protects an accused against a conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged'" (quoting *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970))). A defendant may secure his or her acquittal simply by casting reasonable doubt on the existence of any element of the charged crime. Hence, any defense, except an affirmative defense raised by the defendant, must be disproved by the prosecution beyond a reasonable doubt. *See State v. Davalos,* 113 Hawai'i 385, 387 n. 6, 153 P.3d 456, 458 n. 6 (2007) (explaining that where the criminal defense is not an affirmative defense, the "'defendant need only raise a reasonable doubt as to his guilt'" (quoting *State v. Gabrillo,* 10 Haw.App. 448, 456, 877 P.2d 891, 895 (1994) (quoting Commentary to HRS § 701–115 (1993)))).

In arguing that "all [Ramba] would have to say is, 'Yeah, I lent him the car,' I would probably vote not guilty maybe at that point," the prosecution plainly told the jury that such evidence was necessary for a "not guilty" vote. This was more than merely the interjection of a prosecutor's personal opinion of the defendant's guilt as the majority implies. Majority opinion at 258, 178 P.3d at 24 (noting that, by informing the jury of "how he would vote if he were a juror," the prosecutor "interject[ed] his personal opinion on Lopez's guilt"). Closing argument is "the opportunity afforded the parties to sum up their cases, to establish the relevancy of the evidence to the law and to persuade the jurors as to their theory of the case." *State v. Yamada,* 108 Hawai'i 474, 482, 122 P.3d 254, 262 (2005) (Acoba, J., dissenting).

Thus, in so addressing the jurors there can be no doubt that the prosecution sought to persuade the jurors that in order for them to return a not guilty verdict they should have been provided with Ramba's testimony. According to the prosecution, such evidence would have proved Lopez did borrow the car

("And all he would have to say is[,] 'Yeah, I lent him the car.[']"). Because the jurors were not presented with such evidence, ("Wouldn't you have liked to have heard from [Ramba]? [Lopez] says [Ramba is] a local boy ... would it have been so hard to get him in here to court to tell you guys ... ?"), the inescapable inference left with the jury is that it should vote "guilty."

In advising the jury that Lopez should have brought in such evidence, the prosecution in effect told the jurors it was Lopez's burden to produce such evidence before they could return a verdict of not guilty. But Lopez was not required to produce evidence to prove he borrowed the vehicle. As noted before, "where the criminal defense is not an affirmative defense, the 'defendant need only raise a reasonable doubt as to his guilt.'" *Gabrillo,* 10 Haw.App. at 456, 877 P.2d at 895 (quoting Commentary on HRS § 701–115). Rather, the burden was on the prosecution to disprove any defense raised beyond a reasonable doubt or, correlatively, to prove its case beyond a reasonable doubt. *Id.* ("The burden on the prosecution was to 'prove beyond a reasonable doubt facts negativing the defense[,]'" which it accomplishes "'when the jury believes its case and disbelieves the defense.'" (Quoting Commentary to HRS § 701–115.) (Ellipsis points in original.))

Consequently, in declaring that Lopez needed the favorable testimony of Ramba as a basis for a not guilty verdict, the prosecution shifted the burden to Lopez to prove his innocence, rather than carrying its own burden of disproving the defense raised. The subject arguments by the prosecution were objected to but overruled by the court. Accordingly, "[b]ecause [Lopez's] counsel's objections to these arguments were overruled, the jury would reasonably perceive that the misstatement of the law [by the prosecution] was not incorrect." *See State v. Espiritu,* 117 Hawai'i 127, 143, 176 P.3d 885, 901 (2008). Unlike the statement challenged in Bautista, when considered in context, the statements at issue herein could "have been understood by a reasonable jury as ... *more* than an argument that the jury need not believe uncorroborated defense theories," but one that "suggest[ed] that the defendant has

the burden of producing evidence." *Bautista*, 23 F.3d at 733 (citation omitted) (emphasis added). In effect, the prosecution was telling the jury that in order for it to render a not guilty verdict, it should have evidence that would prove Lopez had borrowed the car. In so arguing to the jury, the prosecution indicated that it was Lopez's duty to produce such evidence before the jurors could return a not guilty verdict.

### III.

Having concluded that the prosecution's comments during closing argument were improper, I next consider whether the statements require vacation of Lopez's conviction. Prosecutorial errors such as improper summation are reviewed under the harmless beyond a reasonable doubt standard, which inquires as to " 'whether there is a reasonable possibility that the error complained of might have contributed to the conviction.' " *State v. McElroy*, 105 Hawai'i 379, 386, 98 P.3d 250, 257 (App.2004) (quoting *State v. St. Clair*, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003) (citations and internal quotation marks omitted)). In this case, there is certainly a "reasonable possibility" that the improper shifting of the burden of proof to Lopez "might have contributed to [his] conviction." *Id.*

As mentioned previously, Lopez testified in his own defense that Ramba, who Lopez purportedly believed to be the owner of the car, gave Lopez permission to use the vehicle. The prosecution's improper statements, which shifted the burden of proof to Lopez, counseled the jury that Lopez's own testimony was insufficient to justify a not guilty verdict by informing them that Lopez was required to provide additional proof that he had the owner's permission to use the car. Thus, there is a "reasonable possibility" that the jury may have believed that Lopez was required to present additional evidence to prove his defense and that such belief "might have contributed to [his] conviction." *Id.* As such, the error was not harmless beyond a reasonable doubt. *See Espiritu*, 117 Hawai'i at 143, 176 P.3d at 885 ("[T]he [court's] failure to correct misstatements of law by a prosecutor [in final argument] may result in reversal of a defendant's conviction." (Citation omitted.)).